## ROHDE v. WAYNE CIRCUIT JUDGE.

INTOXICATING   LIQUORS — WARNER-CRAMTON   ACT — LICENSE —
NUMBER OF SALOONS—INJUNCTION.

In a village of 830 inhabitants having more than one saloon to
500 inhabitants, as limited by the Warner-Cramton law (Act
No. 291, Pub. Acts 1909), three saloon keepers being engaged
in business at the time said law took effect and holding over,
a new applicant should have been denied a license and was
properly restrained from engaging in business by a prelimi-
nary injunction.

#### ON REHEARING.

1. SAME—PREFERENCE—MUNICIPAL CORPORATIONS.

Where relator's application was first considered and granted
by the village council, being filed before April 15th, the
action of such council was a proper exercise of preference; as
it was not intended by the statute to prefer those already en-
gaged in business.   Former opinion reversed.   MOORE, C. J.,
and BLAIR, J., dissenting.

2. SAME—STATUTORY CONSTRUCTION.

If possible, the court should give effect to every word, clause,
and sentence of a statute, and should reconcile the different
provisions so as to render the act consistent.

3. SAME—MANDAMUS.

The fact that the council unlawfully granted licenses to four
applicants, including relator and the three other liquor deal-
ers, should not deprive relator of his remedy.

4. SAME—LOCATION—STATUTES.

That relator intended to conduct a saloon in a residence dis-
trict without having obtained the consent of all property
owners within 300 feet, under section 37 of the act, is not a
sufficient ground of objection, where the proposed location
had been previously occupied for the same purpose.

Mandamus by Fritz Rohde to compel James O. Murfin,
one of the circuit judges of Wayne county, to vacate an
order temporarily restraining relator from engaging in
the sale of intoxicating liquors in the village of Grosse

Pointe, in said county. Submitted May 9, 1911. (Calendar No. 24,612.) Writ denied June 2, 1911. Rehearing granted September 29, 1911. Writ of mandamus granted March 29, 1912.

*George F. & Peter J. Monaghan* (*Alex J. Groesbeck,* of counsel), for relator.

*Miller, Smith, Paddock & Perry,* for respondent.

MOORE, J.   The petition filed in the above case prays for a writ of mandamus to compel the respondent, James O. Murfin, circuit judge, to set aside an order granting and continuing a temporary injunction in a case pending before him, wherein Philip T. Van Zile is complainant and Fritz Rohde and William F. Moeller, county treasurer of Wayne county, are defendants.

The facts which occasioned the issuance of this temporary injunction, as found by the judge, are as follows: That the village of Grosse Pointe has at the present time a population of 830 inhabitants; that on the 2d day of September, 1909, when the so-called Warner-Cramton law went into effect, there were five or six saloons doing business within the corporate limits of the village; that Van Damme, Krumholz, and Doerr were then doing business; that in April of the year 1910 the relator in this case and William R. Dobson both applied for licenses to engage in business at the same site; that both licenses were granted, and Dobson occupied the premises for about a month, and thereafter ceased doing business, whereupon the relator, who had theretofore been granted a license, engaged in business at the same place, and has since continued operating therein; that on the tenth of April of this year Rohde, Van Damme, Krumholz, and Doerr all applied for licenses, and all obtained from the village council licenses to do business in this community. The court further found that the record discloses "that there can be no question but that Mr. Rohde's license was the first one taken up by the village trustees;" that, when

they were considering his bond, a protest was made against the granting of the license.

These findings were fully justified by the evidence. The four licenses mentioned above were all granted at the same meeting. The provisions of law to be construed in this proceeding are found in section 39, Act No. 291, Pub. Acts 1909. It is clear that by the terms of this act "the number of licenses issued shall in no case exceed one to every five hundred inhabitants according to the last United States census, except as provided in said section." We quote therefrom:

"When applied for in accordance with the provisions of this act, bonds shall be approved by the local board, board of trustees, council or common council in each township, village and city for retail liquor dealers, not to exceed the number doing business in said township, village or city in the month of April, nineteen hundred nine: *Provided*, that if after this act takes effect the number of retail liquor dealers in any township, village or city shall be in excess of the ratio of one to each five hundred inhabitants, according to the last United States census, no license or licenses shall be issued to any person or persons to take the place of such license or licenses as shall have been revoked as in this act provided, or that shall voluntarily have been surrendered, until the ratio of the licenses granted, and the saloons in such township, village or city shall not exceed one saloon, for every five hundred inhabitants thereof, according to the last United States census: *Provided further*, that said township board, board of trustees, council or common council, of any township, village or city may by ordinance limit the number of licenses to be granted for such township, village or city; but the number of licenses issued shall in no case exceed one to every five hundred inhabitants according to the last United States census, except as herein provided: *Provided further*, if the applications for such license filed on or before April fifteenth of any year equal or exceed the maximum number permissible under this section, no further application shall be considered."

When this law took effect, the relator was not engaged in the saloon business in the village of Grosse Pointe, and

Van Damme, Krumholz, and Doerr were, and, at the time this proceeding was commenced, were still doing business there, making three saloons in a village of 830 inhabitants. The village council should not have considered Mr. Rohde's application, either in April, 1910, or in April, 1911.

Counsel for relator call attention to *Hanold* v. *Common Council of Stambaugh*, 163 Mich. 242 (128 N. W. 233), and claim it is controlling in his favor. We think a reference to this case will show it is not in point.

The application of the relator is denied, with costs. See *Stenglein* v. *Saginaw Circuit Judge*, 128 Mich. 440 (87 N. W. 449).

MCALVAY, BROOKE, BLAIR, and STONE, JJ., concurred.

### ON REHEARING.

STONE, J. A rehearing has been had in this case. The petition of relator prays for a writ of mandamus to compel the respondent to set aside an order granting and continuing a preliminary injunction in a case pending before him, wherein Philip T. Van Zile is complainant and this relator and William F. Moeller, county treasurer of Wayne county, are defendants. See original opinion, *ante*, 683 (131 N. W. 523).

The original opinion may be referred to for a statement of facts. They are not much in dispute. The relator had, prior to April 10, 1911, filed with the village clerk of the village of Grosse Pointe a written application for license to engage in the retail liquor business. There is no question that this application conformed in all respects to the requirements of Act 291 of the Public Acts of 1909. He was not disqualified from engaging in such business. His application was considered at the regular meeting of the village board on the evening of said day. The record shows that his application was the first considered and approved, and that before action was taken upon other applications. His bond, which appears to have been in

conformity with the provisions of said act, was likewise first considered and approved, and that before action was taken on the remaining bonds. This action was in no way modified or changed by any subsequent action of the board. It is conceded in the said bill of complaint that said village was entitled to not more than three saloons, and that four applications were presented.

In the opinion of the respondent continuing the injunction in force, and after giving his views as to the intention of the legislature, he said:

"This being true, it seems to me that any effort in the case at bar to give a license to do business to Mr. Rohde, who was not doing business at the time this act went into effect, is contravening the express provisions of this act, especially in view of the fact that the other men now licensed to do business by this village council, were doing business at the time the Warner-Cramton law went into effect."

The application of the relator having been first unanimously approved by the board, I am of the opinion that the respondent erred in his construction of the act, and that we reached a wrong conclusion in our former opinion in this case. Under the circumstances here disclosed, any person not disqualified may apply for a license, and a "new man" stands upon an equal footing with those engaged in the business when the act took effect.

In my opinion, the general object of the Warner-Cramton act, so-called, was two-fold; *i. e.*:

(1) To gradually reduce the number of saloons in a municipality, until the number should not exceed the ratio of 1 to each 500 inhabitants, according to the last United States census.

(2) To improve the personnel of those engaged in the traffic, and the character of the business.

In support of the first proposition, we may quote the language of the first part of section 39, which reads as follows:

"When applied for in accordance with the provisions of this act, bonds shall be approved by the local board,

board of trustees, council or common council in each township, village or city for retail liquor dealers, not to exceed the number doing business in said township, village or city in the month of April, nineteen hundred and nine: *Provided*, that if after this act takes effect the number of retail liquor dealers in any township, village or city shall be in excess of the ratio of one to each five hundred inhabitants, according to the last United States census, no license or licenses shall be issued to any person or persons to take the place of such license or licenses as shall have been revoked as in this act provided, or that shall voluntarily have been surrendered, until the ratio of the licenses granted, and the saloons in such township, village or city shall not exceed one saloon for every five hundred inhabitants thereof, according to the last United States census: *Provided further*, that said township board, board of trustees, council or common council of any township, village or city may by ordinance limit the number of licenses to be granted for such township, village or city; but the number of licenses issued shall in no case exceed one to every five hundred inhabitants according to the last United States census, except as herein provided."

The last clause of said section is pertinent and significant in this connection. It reads as follows:

"It is understood that in the counties that have adopted local-option, or may hereafter adopt the same, and afterwards vote to return to the license system, there may be established saloons *not to exceed* one to every five hundred inhabitants of any township, village or city in said counties."

In support of the second proposition, it is only necessary to refer to the general provisions of the act that a license can be granted only to citizens of the State of Michigan and of the United States. It cannot be granted to a woman, nor to any person who has served time in any State prison or penitentiary of this or any other State, nor to any person who, since the act took effect, has been twice convicted of any violation of the liquor laws of this State, or of any other State. (Section 4.)

I am also of the opinion that the general purpose of this

act to improve the personnel of the business is evidenced by the following provision of section 39 of the act:

"*Provided further*, if the applications for such license filed on or before April fifteenth of any year equal or exceed the maximum number permissible under this section, no further application should be considered; and if such applications exceed such maximum number the township board or village or city council shall grant the maximum number, *and shall determine which of the applications so filed shall be granted.*"

This provision plainly gives the license-giving authority the power to exercise its discretion and judgment as to which of the applicants, in such a case, are most likely to carry on the business in compliance with the law. If the number of eligible applicants exceeds the number of licenses which can be granted, preference should first be given to those whose applications were filed on or before April 15th, and "after that to applications in the order in which the same are filed." In other words, where the number of eligible applications for licenses exceeds the number of licenses to be issued, the license-issuing authority has a right, subject to the above limitations, to determine to whom licenses shall be granted. In making this determination, the act does not provide that preference shall be given to those already engaged in the business. To give any such preference would be to give to those already in business a vested right therein, beyond the life of their licenses, and this cannot reasonably be claimed. This legislation was a reasonable regulation of the business, which the legislature had the power to enact. *Reithmiller* v. *People*, 44 Mich. 280–285 (6 N. W. 667); *Fuchs* v. *Grass Lake Common Council*, 166 Mich. 569 (132 N. W. 96).

The language that the license-issuing body, in the instance stated, "shall determine which of the applications so filed shall be granted" is plain and unambiguous. These words should be given their common and ordinary meaning. It is a cardinal rule in the construction of

statutes that effect is to be given, if possible, to every word, clause, and sentence. It is the duty of the court, so far as practicable, to reconcile the different provisions, so as to make them consistent and harmonious, and to give a sensible and intelligent effect to each. 36 Cyc. pp. 1128, 1129. This construction of the statute is, I think, a reasonable one; and nothing will tend more effectually to improve the conduct and manner of business of the saloon keeper than to have it understood and distinctly held that in cases like the instance named, *i. e.*, where the applications filed on or before April 15th of any year exceed the maximum number of saloons permissible, the license-issuing body may exercise its discretion and judgment, and determine which of the applicants shall be licensed, without reference to the fact of whether they are, or are not, already engaged in the business.

It is said that if this court grants the writ of mandamus as prayed for, the effect will be to give the village of Grosse Pointe four saloons; while the law says only three should be allowed. The same objection was made in *Hanold* v. *Common Council of Stambaugh*, 163 Mich. 242 (128 N. W. 233); but it was held that that fact should not deprive the relator of the relief prayed for, as he was not responsible for the unlawful action of the council.

It is also urged that the right of relator to conduct a saloon at the corner of Jefferson avenue and Fisher road (it being in a residence district) is involved here; and that "consent of all the property owners within three hundred feet of the proposed bar or saloon" should be obtained, under the provisions of section 37 of the act. But it should be borne in mind that by the terms of the proviso at the close of said section it is provided that "none of the provisions of this section shall apply to any bar or saloon established and existing at the time this act takes effect." The bill of complaint in the cause, wherein the injunction complained of was issued, expressly stated that William R. Dobson, for several years prior to May 1, 1910, had been conducting a saloon at the corner of

Jefferson avenue and Fisher road in said village. It would therefore appear that said section 37 has no application here.

The writ of mandamus should issue as prayed for, but without costs.

STEERE, McALVAY, BROOKE, OSTRANDER, and BIRD, JJ., concurred with STONE, J.

MOORE, C. J. (*dissenting*). An opinion was handed down in this case June 2, 1911. It is found *ante*, 683 (131 N. W. 523). A rehearing has been had. A reference to the opinion which was filed will be helpful now.

I do not think upon any theory of the case a different result should be reached from the one heretofore announced. What was done by the village council about relator's application was not shown upon the trial in the court below by the records of the village, but was shown by the oral testimony of two of the village trustees. The trial judge found, in addition to what is stated in the former opinion, the following:

"So far as the record before me now discloses, there can be no question but that the record clearly indicates that Mr. Rohde's license was the first one taken up by the village trustees, and that before they had completed their action upon, and while they are considering his bond, before it had been approved, a protest was lodged with them against granting the license to this man."

The record also discloses that at this same session the applications for licenses of three other saloon keepers were considered and approved. It further shows that their bonds were approved; that they paid their license fees, and are now keeping saloons in the village of Grosse Pointe.

In construing the statute, the learned circuit judge expresses himself as follows:

"It seems to me, to resume, as far as the law is concerned, that a fair construction of the act indicates, first, a desire on the part of the legislature to limit the number

of saloons in any municipality or village to 1 to every 500 of the population, with the further proviso that the city authorities or municipal authorities could reduce the number of saloons in each particular location, if they so desire. The act further indicates a desire not to cause this legislation to interfere with existing businesses. Therefore it is provided that the number of licenses in a particular muncipality may remain the same as there were saloons doing business at the time the act took effect, provided—and this is the significant language of the act, so far as its applicability to the case before me is concerned—that no license should be issued to any person to take the place of such license or licenses as shall have been revoked, or that shall voluntarily have been surrendered. It seems to me that language indicates an expression from the legislature of a method of reducing the number of saloons, where the number was in excess of the ratio prescribed."

If this is a proper construction of the law, and about that I express no opinion, then clearly the relator was not entitled to a license.

On the other hand, it is said the general object of the Warner-Cramton act, so called, is twofold :

(1) To gradually reduce the number of saloons in a municipality until the number should not exceed the ratio of 1 to each 500 inhabitants, according to the last United States census.

(2) To improve the personnel of those engaged in the traffic, and the character of the business.

If it is conceded that this is the proper construction, it is clear from this record that the village council did not attempt to accomplish either object; and that if we issue this writ as asked by the relator neither of those purposes will be accomplished. If the village council had attempted to accomplish the first of these objects, as it was its duty to do, it would have approved of but three licenses and three bonds; but it in fact at the one session approved four licenses and four bonds. If the village council had attempted to accomplish the second object, above stated, it would, when four applications were presented, have selected therefrom three persons who were most fit, and rejected

the application of the fourth one.  The record shows it did nothing of the kind, but, on the contrary, approved all four of the applications, without attempting to select the three most fit to conduct the business.

The result of the action of the council is that already the full number of saloons to which the village is entitled are now engaged in business.  There is nothing in the record to show that relator's application was approved, first, because the village council thought he was one of the three most fit to engage in the business, or that the council attempted to improve the personnel of those engaged in the business by rejecting the most unfit.

If this court grants the writ of mandamus as requested, the effect will be to give to the village of Grosse Pointe four saloons; while the law says only three should be allowed to do business in that village.  The application should be denied; but, as the rehearing was ordered by the court, it should be without the costs of this rehearing.

BLAIR, J., concurred with MOORE, C. J.

BLAIR, J.  I concur in denying the writ.  In my opinion, the circuit judge correctly construed the provisions of section 39 of Act No. 291 of the Public Acts of 1909 as giving a preference to retail liquor dealers engaged in business in April, 1909, over other applicants for licenses not so engaged.  In construing a statute, it is the primary duty of the court to so interpret it as to give effect to the intention of the legislature.  Applying this principle to the construction of the provisions in question, it appears to me to require the construction given by the circuit judge.  To my mind, the provisions of this act clearly indicate an intention on the part of the legislature to protect the property of those engaged in business in April, 1909, against loss from being forced out of business, provided they possessed the qualifications for a license required by the statute, and to provide for a gradual reduction of the number by voluntary surrender and by revocation.

Section 37 appears to me to strongly support this view. By that section, existing saloons within a certain distance of churches and schoolhouses, or in a residence district, are protected, although licenses are prohibited for the establishing of new bars or saloons within such limits. Section 39 provides that proper bonds shall be approved, not to exceed the number of dealers doing business in April, 1909:

"*Provided*, that if after this act takes effect the number of retail liquor dealers * * * shall be in excess of the ratio * * * no license or licenses shall be issued * * * to take the place of such license or licenses as shall have been revoked as in this act provided, or that shall voluntarily have been surrendered, until the ratio of the licenses granted, and the saloons * * * shall not exceed one saloon for every five hundred inhabitants," etc.

This act took effect September 1, 1909, and its provisions, relative to applications for licenses and bonds, relate, therefore, for the most part, to April, 1910, and ensuing years.

It appears to me, therefore, from the provisions quoted that it was the intention of the legislature that the township boards, etc., in April, 1910, should grant as many licenses and approve as many bonds as there were retail liquor dealers doing business in April, 1909, and still doing business in April, 1910, and that such number could only be reduced by voluntary surrender or by revocation. Unless this be the proper construction, the council or board, in April, 1910, could at once reduce the number of saloons to the statutory ratio, the power to do which would be inconsistent with the provisions now under consideration and with the proviso:

"*Provided further*, that said township board * * * may by ordinance limit the number of licenses to be granted; * * * but the number of licenses issued shall in no case exceed one to every five hundred inhabitants, * * * *except* as herein provided."

The only provisions to which this *exception* in the pro-

viso can reasonably apply are those providing for licenses to be issued to the number of dealers doing business in April, 1909, which supports the interpretation above given, at least as to the number of dealers entitled to licenses. But, assuming that this interpretation is correct as to the number of dealers, does it follow that the dealers doing business in April, 1909, and still in the business when their applications for licenses are presented, are entitled to preference over other applicants desiring to engage in the business? It is argued that such construction is excluded by the proviso that if the applications exceed the maximum number "the township board or village or city council shall grant the maximum number and shall determine which of the applications so filed shall be granted."

If by this argument it is intended to indicate that the maximum number referred to is in accordance with the statutory ratio, without reference to the number in the business in April, 1909, it would seem to be opposed to the view expressed in the opinion of Justice STONE that the statute contemplates a gradual reduction of the number of saloons. As I understand his opinion, the dealers engaged in business in April, 1909, must be taken into account in determining the number of licenses to be granted, but not in determining to whom such licenses shall be granted; or, in other words, that the local legislature cannot reduce the number of saloons, except where the license has been revoked or voluntarily surrendered, but that, where there are 1,700 applicants and only 1,500 licenses can be granted, those applicants in the business possess no superior rights.

I think that the discretion vested in the local licensing body to determine to whom the licenses should be granted should be held to apply only to cases where, a local-option county having returned to sales of liquor, there are no dealers engaged in the business at all, and to cases where such licensing body has, by ordinance, changed the ratio, so as to provide for a less number of dealers, *e. g.*, 1 to 1,000 inhabitants, or to cases where the number of dealers in

April, 1909, is less than authorized by the statute, or where, by revocations or surrenders, the original number has been reduced below the maximum, in which event the board may exercise its discretion as to whom it will license to bring the number up to the maximum.

I am firmly persuaded that the legislature, recognizing some elements of justice in the claim that the property of the men engaged in the business should receive some protection—a claim which, though not sustainable in law, had been and was vigorously asserted—and to avoid even the appearance of confiscation, intended by the somewhat contradictory provisions of this section to protect the dealers engaged in the business when the law took effect. I am very much strengthened in this view by the consideration that this must have been the intention of section 37. That section protects the particular saloon keeper in the particular saloon at a particular location, since any saloon located at a new place would be a new saloon, and a saloon at the same place, but by a new person, under a new license, would also be a new saloon. Furthermore, that the law relates to the dealer, and not to the place in which he deals, is indicated by the fact that it is the disqualification of the dealer which gradually diminishes the excess of saloons.

It is clear that the primary intention of the legislature was to limit the number of saloons. I can see a good reason for providing that such limitation should not affect the men already in the business, who should conduct their business with the propriety required by the statute. I can see no good reason for providing that the number of saloons shall not be reduced, except by revocations or surrenders, if all of the old dealers may be turned out, and an entire new set may be put in. Why should the legislature have any hesitation in providing that in 1910 the licensing board should issue the number of licenses required by the statutory ratio, which, in the judgment of the legislature, was a sufficient number, except to protect those already in the business? Again, I think, viewed

from the standpoint of public policy, the same result must follow.   A man whose right to continue in the business depends upon his own conduct of the business, regardless of his political influence, is far more likely to conduct his business properly than one who understands that, however upright his behavior, and no matter how closely he observes the law, however much he may have improved his property, and however great his investment, he is liable each year to be turned out of his business by some ward heeler with greater influence with his political boss.   This is precisely what, in my view, the legislature sought to prevent.

MOORE, C. J., concurred with BLAIR, J.