BOYER-CAMPBELL CO. *v.* FRY.

1. STATUTES—CONSTRUCTION—LEGISLATIVE RESOLUTION.
   Legislative resolutions declaring intent of an enactment are not law, although they are entitled to respectful consideration.

2. SAME—CONSTRUCTION BY PUBLIC OFFICERS.
   The practical construction given to doubtful or obscure laws in their administration by public officers and departments with a duty to perform under them is given weight in construing such laws and sometimes deferred to when not in conflict with the indicated spirit and purpose of the legislature.

3. SAME—OBSCURE LANGUAGE—CONSTRUCTION.
   Obscure language of a statute must be so construed by the courts as to give it a reasonable and sensible interpretation but the courts must obey and enforce clear and unambiguous statutes.

4. SAME—CONSTRUCTION—PUBLIC CONVENIENCE AND INTEREST.
   Statutes will be construed in the most beneficial way which their language will permit to prevent absurdity, hardship or injustice; to favor public convenience and to oppose all prejudice to public interests.

5. SAME—LEGISLATIVE DEFINITIONS—COMMON TERMS.
   The court is bound to accept a legislative definition, if indulged, even though at variance with common understanding and lexicographers, but when the legislature employs a common term as indicative of the purpose of an enactment, without further definition or designation, the term speaks its ordinary sense.

6. SAME—EFFECT OF HARSH CONSEQUENCES.
   Though true construction of a statute be followed with harsh consequences, the courts are not to be influenced thereby in administering the law, the justice or wisdom of legislation being solely a legislative matter and its construction within the province of the courts.

7. TAXATION—GENERAL SALES TAX ACT.
   The general sales tax act imposes a tax upon sale of tangible personal property which is consumed or used and exempts only

that which is sold for resale, the basis of classification being the disposition of the goods made by the buyer, not the character of the business of the seller or buyer (Act No. 167, Pub. Acts 1933).

8. SAME—SALE AT RETAIL—GOODS CONSUMED.

Taxation as sale at retail of gross proceeds of sales of tangible personal property to manufacturers, producers or processors, which is consumed by them in manufacturing, producing or processing and does not become an ingredient or component part of the tangible property manufactured, produced or processed and exemption from taxation of such property as becomes an ingredient *held,* proper interpretation of general sales tax act (Act No. 167, § 1 [b. 1, b. 2], Pub. Acts 1933).

9. CONSTITUTIONAL LAW—GENERAL SALES TAX ACT—PRESUMPTIONS.

It is to be presumed that the legislature intended to adopt a constitutional general sales tax act (Act No. 167, Pub. Acts 1933).

10. COSTS—PUBLIC QUESTION—GENERAL SALES TAX ACT.

No costs are allowed in suit by manufacturers and distributors for declaration of rights under the general sales tax act, a public question being involved (3 Comp. Laws 1929, §§ 13903–13909; Act No. 167, Pub. Acts 1933).

Appeal from Wayne; Miller (Guy A.), J. Submitted January 29, 1935. (Docket No. 128, Calendar No. 38,201.) Decided April 9, 1935.

Bill by Boyer-Campbell Company and McAleer Manufacturing Company, Michigan corporations, against Theodore I. Fry, State Treasurer, and others comprising the State Board of Tax Administration, for declaration of rights under the general sales tax act. Automotive Tool & Die Manufacturers Association and others intervened as parties plaintiff. Decree for plaintiffs. Defendants appeal. Modified and affirmed.

*Berry & Stevens* (*Raymond H. Berry, Ralph W. Barbier* and *Arthur L. Evely,* of counsel), for plaintiffs and certain interveners.

*Harold R. Martin* (*Goodenough, Voorhies, Long & Ryan* and *W. D. Gowans,* of counsel), for intervener White Star Refining Company.

*Lawhead & Kenney,* for interveners Superior Pattern & Manufacturing Company and City Pattern Works.

*Lucking, Van Auken & Sprague,* for intervener Hoskins Manufacturing Company.

*Oxtoby, Robison & Hull,* for interveners Detroit Edison Company and Holcraft & Company.

*Howard C. Chilson* and *Fred H. Dye,* for intervener Ex-Cell-O Aircraft & Tool Corporation.

*Bulkley, Ledyard, Dickinson & Wright,* for intervener Automotive Tool & Die Manufacturers Association.

*Harry S. Toy,* Attorney General, *Peter J. Monaghan, Jr.,* and *Edmund E. Shepherd,* Assistants Attorney General, for defendants.

BUSHNELL, J. This appeal is with respect to the meaning of that portion of Act No. 167, Pub. Acts 1933, approved June 28th, and known as the "general sales tax act," which reads:

"The term 'sale at retail' means any transaction by which is transferred for consideration the ownership of tangible personal property, when such transfer is made in the ordinary course of the transferor's business and is made to the transferee for consumption or use or for any other purpose than for resale in the form of tangible personal property." Section 1 (b. 1).

"The term 'sale at retail' includes sales of electricity for light, heat and power and sale of natural and artificial gas when made to the consumer or

user for consumption or use rather than for resale."
Section 1 (b. 2).

The State board of tax administration issued "preliminary regulations" on June 30, 1933, in which it said, on page five:

"Receipts from sales of goods which as ingredients or constituents go into and form part of tangible personal property sold by the buyer are not taxable. It makes no difference that the goods are resold in a different form or condition. * * *

"In general, the taxes (*sic*) imposed upon all persons engaged in the business of selling tangible personal property for consumption or use, or for any other purpose but resale, it is intended to cover the receipts from a sale which constitutes the last actual transaction, prior to the ultimate use or consumption, that is, the transaction by the last person in the chain prior to the actual use or consumption."

Then follow certain illustrations.

Doubt and confusion having arisen during the drafting of the regulations as to the applicability of the act to certain businesses, the legislature reconvened and on July 18th passed house concurrent resolution No. 98, which reads in part:

"Resolved, that it was the intent of the legislature that the State board of tax administration be empowered and authorized by said act to define and liberalize the definition of a sale at retail; and * * *

"Resolved, that the legislative intent, in passing Act No. 167, Pub. Acts 1933, was to exclude from the provisions of the act any sale of anything used exclusively in the manufacturing, assembling, producing, preparing, or wrapping, crating, and/or otherwise preparing for delivery any tangible personal property to be sold; and be it further

"Resolved, that the word 'producing' as used herein shall include agricultural production."

This resolution was followed by certain supplementary regulations and decisions, issued by the board and dated July 20, 1933. Trade ruling No. 3 thereof reads in part:

"In general, the tax is imposed upon all persons engaged in the business of selling tangible personal property to the consumer for use. It is intended to cover receipts from a sale which constitutes the last actual transaction prior to ultimate use or consumption; that is, the transactions by the last person in the chain prior to actual use or consumption. * * *

"The manufacturer of the ice cream in the example mentioned may require machinery, freezers, fuel, power, ammonia or ice and similar equipment and supplies. The tax would apply to the receipts from the sale of these things to the ice cream manufacturer. They are consumed in the production or manufacture of the ice cream. They do not go into and form a part of the product sold as ingredients or constituents. They are purchased for consumption and not for resale within the meaning of the act."

On August 30th the board took a contradictory position and by resolution declared that it should be the policy to interpret the act "to comply with the clear intent of the legislature," so as

"To exclude tangible personal property used in the processing, producing and/or manufacturing of tangible personal property to be ultimately sold at retail, including any article used in the wrapping, crating and/or otherwise preparing for delivery any tangible personal property to be sold."

And further declared that:

"The intent of this act is recognized by the board to include only sales commonly known as counter

sales of tangible personal property to be used or consumed by the individual.''

This action was rescinded on September 25, 1933, on advice of the attorney general (see Opinions of Attorney General, 1933–1934, p. 321), and the present attitude of the board is now expressed in article 26 of its supplemental regulations and decisions as of January 1, 1934:

''Sales to manufacturers, producers or processors. Gross proceeds from sales of tangible personal property to manufacturers, producers or processors, which is consumed by them in manufacturing, producing or processing and does not become an ingredient or component part of the tangible property manufactured, produced or processed, are taxable. The manufacturer, producer or processor is the final buyer or ultimate consumer of such tangible personal property and does not purchase it for resale.

''Gross proceeds from sales of tangible personal property to manufacturers, producers or processors, which enters into and becomes an ingredient or component part of the tangible personal property which they manufacture, produce or process, are not taxable. The fact that the article manufactured, produced or processed is in a different form or of a different character is immaterial.

''To illustrate: Machinery, fuel, pattern paper, needles, chalk, etc., sold to a clothing manufacturer are purchased by him for consumption or use and not for resale. Receipts from such sales are taxable, as these materials do not become a component part of the clothes manufactured. On the other hand, woolens, linings, buttons, and thread sold to a clothing manufacturer do become a component part of the clothes manufactured. Gross proceeds from such sales are not taxable, as the manufactured clothing is resold.

"To illustrate further: Certain chemicals, such as sulphuric acid and chlorine, are sold to paper manufacturers for treating and cleaning raw materials. They do not become a part of the finished product; the paper manufacturer is the final buyer or ultimate consumer thereof, and such sales to him are taxable. Pulp wood sold to paper manufacturers becomes a component part of the finished product, therefore is not taxable, as the manufactured paper is resold."

The legislature on December 20, 1933, after the board had changed its construction of the act,

"Resolved * * * That the legislature hereby requests the State board of tax administration to abide by the legislative intent relative to Act No. 167, Pub. Acts 1933, as contained in house concurrent resolution No. 98 of the 1933 session of the legislature;" etc.

Plaintiff Boyer-Campbell Company filed a petition for a declaratory judgment of its rights under the provisions of Act No. 36, Pub. Acts 1929 (3 Comp. Laws 1929, §§ 13903–13909), and other parties named in the title of this opinion were granted leave to intervene. We have noted in the margin hereof the general nature of the property sold by the various plaintiffs and the decree entered in their favor from which the defendants have appealed.*

---

* LIST OF PLAINTIFFS AND GENERAL NATURE OF PROPERTY SOLD

Boyer-Campbell Company, Towner Hardware Company, Factory Supply Company, Charles A. Strelinger Company, Smith-Winchester Company, Rayl Company and Buhl Sons Company: Sell factory and mill supplies, hardware and various kinds of machinery, to industrial establishments.

Gorham Tool Company, and Ex-Cell-O Aircraft & Tool Corporation: Manufacture and sell tools to other manufacturers, 10 per cent. of

which is standard, the remainder being special tools made according to specifications.

McAleer Manfg. Company, and Bruce Products Company: Manufacture and sell to other manufacturers polish, cleaner, wax, enamel, deodorizer and buffing compositions.

Wayne Chemical Products Company: Manufactures and sells to metal working factories, lubricants used in high speed drilling and non-rust oils used to protect metal articles during shipment and storage.

Detroit Ball Bearing Company: Sells ball and roller bearings, about 67 per cent. of which are used in the operation and maintenance of machinery in manufacturing and industrial plants.

I. E. Swift Company: Sells mine and lumbering supplies to copper and iron mines, and lumbering concerns.

Frederick B. Stevens, Inc., and E. J. Woodison Company: Manufacture and sell—A. T. Wagner Company, only sells: foundry, plating and polishing supplies to foundries and manufacturers.

Superior Pattern & Manfg. Company, and City Pattern Works: Make and sell patterns for castings.

Eaton-Clark Company: Distribute industrial chemicals and dye stuffs; manufacture and sell cleaning soaps to manufacturers of automobiles, foods, beverages, ice, ice cream, photo engravers and paint, varnish and textile mills.

Detroit Edison Company: Generates and distributes electricity for light, heat and power.

White Star Refining Company: Produce and refine industrial oils, gasoline and kindred products.

Hoskins Manfg. Company, and Holcroft & Company: Manufacture and sell electric furnaces, etc., to industrial plants for heat treating tools and parts.

Borden's Farm Products Company: Manufactures and sells ice cream, milk and other dairy products.

Cadillac Chemical Company: Distributes and sells industrial chemicals, alkali, silicate and laundry supplies used in manufacturing and industrial plants, laundries and other service industries.

R. C. Gibson Company: Distributes and sells laundry and dry-cleaning supplies to laundries, dry cleaners and hospitals.

### CIRCUIT COURT DECREE

"IT IS ORDERED, ADJUDGED AND DECREED, and this court by virtue of the authority therein vested and in pursuance of Act No. 36, Pub. Acts 1929, does hereby declare and determine that Act No. 167, Pub. Acts 1933, is a valid exercise of the taxing power of the State of Michigan and is constitutional; and, as a binding declaration of rights, further declares that the proper meaning and construction of Act No. 167, Pub. Acts 1933, is as follows:

"1. That said Act No. 167, Pub. Acts 1933, does not apply to nor impose a tax upon the gross proceeds of sales of tangible personal property when such property is imported into the State of Michigan and such sales are made by the importer and in the original package.

"2. That said Act No. 167, Pub. Acts 1933, does not apply to nor impose a tax upon the gross proceeds of sales of tangible personal property to the ultimate consumer, when such sales require delivery by foreign or interstate shipments.

"3. That said Act No. 167, Pub. Acts 1933, does not apply to nor impose a tax upon the gross proceeds of sales by said plaintiffs and/or any of said intervening plaintiffs of tangible personal property to vendees to be used or consumed, directly or indirectly, in connection with the manufacture, processing, assembly, productions, preparation, and/or delivery of tangible personal property destined for resale.

"4. That said Act No. 167, Pub. Acts 1933, does not apply to nor impose a tax upon the gross proceeds of labor performed and/or services rendered.

"5. That said Act No. 167, Pub. Acts 1933, does not apply to nor impose a tax upon the gross proceeds of sales of electricity for light, heat and/or power to vendees when such electricity is to be used or consumed, directly or indirectly, in connection with the manufacture, processing, assembly, production, preparation and/or delivery of tangible personal property destined for resale.

"6. That under the terms of said Act No. 167, Pub. Acts 1933, no assessment of any alleged deficiency in the amount of taxes paid by the taxpayers shall be made and/or no demand for the payment of same shall be made and/or no proceedings shall be instituted to collect such alleged deficiency, except as provided in section 14 of the said act, until and unless the following procedure is followed:

"(a) That the State board of tax administration give the taxpayer notice of the intention to levy such deficiency.

"(b) That the State board of tax administration grant such taxpayer 20 days within which to demand a hearing on the question of the levy of such deficiency.

"(c) That, in the event the taxpayer demands such a hearing, the State board of tax administration set a time and place for the hearing and give the taxpayer reasonable notice thereof.

"(d) That the taxpayer be permitted to appear before the said board at such hearing and may be represented by counsel and present testimony and argument.

"(e) That, after such hearing, the State board of tax administration shall render its decision in writing and by order levy any deficiency found by it to be due and payable.

"7. That said Act No. 167, Pub. Acts 1933, does impose a tax upon the gross proceeds of sales of goods which are subsequently used in the rendition of service in the laundering of clothing and other articles.

"AND IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that the Detroit Edison Company, one of the intervening plaintiffs, is entitled to recover from the State of Michigan all amounts paid by it under protest under the provisions of said Act No. 167, Pub. Acts 1933, for and on account of itself and The Peninsular Electric Light Company, a wholly owned subsidiary, which amounts represent the tax upon the gross proceeds of sales of electricity for light, heat and/or power to its customers, who used or consumed such electricity, directly or

Appellants' brief contains certain concessions which, because of their importance, are quoted in full in the margin under the heading "restricting the issue," the references being to pages of the record before us.†

indirectly, in connection with the manufacturing, assembling, producing, processing, preparing and/or delivering of tangible personal property destined for resale the amounts which said company is so entitled to recover to be agreed upon by and between said defendants and said company, and in the event of their disagreement, the amounts thereof to be hereafter fixed and determined by this court upon a petition to be hereafter filed in this cause by either of said parties, the amount so due to said company, with interest according to law, to be either repaid to it, or allowed to it as a credit upon payments of sales tax to be hereafter due from it to the State under said act.

"AND IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that the court reserves the right and retains exclusive power and jurisdiction to hear and determine, upon reasonable and proper notice, any and all controversies as to what further relief based upon the declaration of rights herein made shall hereafter become necessary or proper, all in accordance with the statute in such case made and provided."

† RESTRICTING THE ISSUE

(From Appellant's Brief)

"While the plaintiffs' petition for declaration of rights (80–109), and some 19 ancillary petitioners subsequently filed (110–259), together with considerable testimony taken in support thereof (311–556), cover over 400 pages of the printed record, upon final analysis we believe the issue narrows down to question five, as framed in our counter-statement. We make the following concessions to serve that purpose:

"1.  The circuit court for the county of Wayne, in chancery, had jurisdiction. Defendants' motion to dismiss the 'bill of complaint (303–305),' was based largely upon this claim, and the matter was disposed of on order denying the motion (309). Although the question of right to sue the State has not been set entirely at rest by this court, and there may be some slight shadow of doubt cast over the entire proceeding (*Edward Thompson Co.* v. *Maynard*, 269 Mich. 97), we realize that ultimately the major question involved at bar must be settled, and, since there is no practical object in delaying its consideration, we waive and concede the point.

"2.  We concede that, under the statutory definition of 'retail sale,' set forth in Act No. 167, § 1, Pub. Acts 1933, the privilege tax imposed may not be computed upon the basis of gross proceeds derived from sales of tangible personal property which becomes a tangible component of any manufactured product resold by the transferee.

Appellants say the sole question presented by this record is:

"Does the statutory definition of 'sale at retail' include a transaction by which is transferred for consideration the ownership of machinery, tools, materials, and/or supplies, when such transfer is made in the ordinary course of the transferor's business, and is made to a manufacturer for his use and consumption in the processing, assembly, production and/or preparation of the produce of the manufacturer, it appearing, however, that such machinery, *et cetera,* so transferred, used and/or consumed, does not become, in a physical sense, a tangible component of such manufactured product?"

The question was stated by the learned trial judge to be:

"Must personal property sold to a manufacturer, in order that the sale thereof be exempt from tax, reappear tangibly in tangible personal property intended for resale?"

Appellees' brief says:

"The issues in this proceeding may be reduced to a simple statement and a simple question: The general sales tax act, if interpreted by this court as defendants would have it interpreted, will cause great and irreparable injury to business interests throughout the State of Michigan, will result in unmerited and unintentional discrimination and will produce a result close to economic disaster. In the face of such results, has this court the authority to

"3. It must further be conceded that the political and economic arguments advanced by the plaintiffs and interveners in the court below, against the levy of this tax, are cogent and reasonable. Beyond all shadow of doubt, the levy of this tax upon certain dealers may result disastrously. But these, as we claim, are arguments more properly addressed to the legislative body (now in session), and, unless plaintiffs' legal position is sound, the courts can afford no relief."

undertake a construction of the act designed to restrict its application in accordance with the intention of the legislature which passed it?''

The history of the general sales tax act, and comparable tax statutes elsewhere, may be found in "The Sales Tax in the American States," Haig & Shoup, Columbia University Press, 1934. See, also, 33 Mich. Law Review (February, 1935), 614 *et seq.* Because of the comparative newness of the subject matter, the only decisions we have found in courts of last resort are those affecting the Illinois, Washington and Kentucky acts. *Winter* v. *Barrett,* 352 Ill. 441 (186 N. E. 113, 89 A. L. R. 1398), held the act of March 22, 1933, unconstitutional, and *Reif* v. *Barrett,* 355 Ill. 104 (188 N. E. 889), was to the opposite effect as to. a subsequent act. In *State, ex rel. Stiner,* v. *Yelle,* 174 Wash. 402 (25 Pac. [2d] 91), the Washington court, in a five-to-four opinion, held that the "occupation tax" act, chap. 191, session laws 1933, "does not offend against either the Federal or the State Constitution." March 11, 1935, the Supreme Court of the United States in *Stewart Dry Goods Co.* v. *Lewis,* 294 U. S. 550 (55 Sup. Ct. 525), and three consolidated cases, held the Kentucky act, chap. 149, Acts of 1930, p. 475, unconstitutional. Counsel have appended as exhibits the opinions of the learned judges of the circuit court for Ingham county and Kent county as to matters there presented, the reasoning of which is offered as an aid to us.

We quote the following from plaintiffs' brief:

"In this proceeding this court is called upon to render a decision which must inevitably be an important factor in determining the future course and progress of business and of general economic wel-

fare in the State of Michigan. Already some 25 plaintiffs representing an important portion of the wholesale business interests of this State have joined in this action. These plaintiffs, however, represent but a small proportion of the whole mass of business enterprise which will be vitally affected by the interpretation placed by this court on the general sales tax act. All wholesalers, who make sales to manufacturers and industrial vendees, are concerned. All vendors of equipment, seed, feed and fertilizers to farmers are concerned. In consequence, the entire manufacturing and farming industries of the State, as buyers of these products, and, therefore, as potential payers of the tax, are necessarily involved in this controversy. * * *

"Moreover, this court is called upon to render its decision at a time when the business of this commonwealth, no less than the business of the country as a whole, and, in fact, of the entire world, is just beginning to emerge from the most serious economic depression of our history. Economic conditions, nationwide and worldwide, which are beyond our control have, during the past few years, placed serious and almost insuperable obstacles in the way of business progress. Those obstacles are beginning to be overcome. There can be no question, however, but that a decision in this proceeding adverse to the plaintiffs will place a new obstacle and, for many of those plaintiffs, an insurmountable obstacle, in the path of business advance and economic recovery.

"The imposition of a sales tax by the State of Michigan at a rate of 3 per cent. on wholesale sales will not destroy the business of wholesaling in the United States. The record in this proceeding makes it abundantly clear, however, that such an imposition will drive that business in large measure out of the State of Michigan. Of this no one can have reasonable doubt. The margin of gross profit in the wholesale trades is not the 20 per cent. to

50 per cent. margin, which is common in retail business, but a margin of 10 per cent. or 5 per cent. or 3 per cent. Wholesalers, in general, cannot pay a tax of 3 per cent. on their gross proceeds of sales and absorb this tax and continue to operate. On the other hand wholesalers, for the most part, cannot pay such a tax and pass it on to their vendees, as is contemplated by section 23 of the act, because any attempt to do so will merely make a gift of the business to their out-of-State competitors.   *   *   * It needs no argument on the part of counsel for plaintiffs to demonstrate that an exodus from this State of all of its wholesale business, or of a half of it, or a quarter, would be for the State an economic disaster of the first magnitude.''

It might be observed that the desired relief may be secured from the legislature which has been in general session for the last three months; but so far has not spoken on the matter. We should be mindful of the general breakdown of the former tax structure of the State and the relieving of real property from all tax burden for State expense (save that required by law for certain educational institutions. See Constitution, article 11, § 10, and 2 Comp. Laws 1929, §§ 7792–7794, 7884, as amended), and substitution therefor of the tax in question. The matter is of too much importance to the ultimate taxpayer, the consuming public, to be unmindful of his silent presence in our deliberation, though not represented at bar by a special pleader. As observed by Haig & Shoup, p. 257:

''It is to be noted that the manufacturers, complaining that such treatment (the board's interpretation of the act) will drive them, or their trade, out-of-state, do not mention the large saving in property taxes which the sales tax has made possible.''

The same text at page 581 says:

"The distinction between sales at retail and wholesale seems to turn upon either the disposition of the goods made by the buyer or the character of the business activity of the parties concerned."

Again at page 583, in discussing the problems involved in administering the "disposition" test, the authors speak of—

"Cases which concern the necessity for, or the essential characteristics of, a subsequent transfer of possession in determining whether a particular purchase had been for use or for resale. (a) The article is consumed in the production of another commodity, without becoming a part thereof (such as coal used by a manufacturer), in the sale of a commodity (such as electricity in a retail store), or is 'used' over a period of time in either production or sale (such as the use of machinery or fixtures). (b) The commodity is resold as a chemically identifiable ingredient in the thing sold (*e. g.*, perfume in soap), as a severable part of the article sold (*e. g.*, bumpers on a car), or in a different form or shape, but with the same chemical constitution (*e. g.*, logs resold as lumber)."

Legislative resolutions are not law, although they are entitled to respectful consideration (*Becker* v. *Detroit Savings Bank,* 269 Mich. 432), and "the construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons." *United States* v. *Moore,* 95 U. S. 760. See, also, *Fawcus Machine Co.* v. *United States,* 282 U. S. 375, 378 (51 Sup. Ct. 144). However, these are not binding on the courts, *People, ex rel. Simmons,* v. *Anderson,* 198 Mich. 38, and "While not controlling, the practical construc-

tion given to doubtful or obscure laws in their administration by public officers and departments with a duty to perform under them is taken note of by the courts as an aiding element to be given weight in construing such laws and is sometimes deferred to when not in conflict with the indicated spirit and purpose of the legislature." *Board of Education of Owosso* v. *Goodrich,* 208 Mich. 646, 652. See, also, *Bankers Trust Co. of Detroit* v. *Russell,* 263 Mich. 677, 684.

"Where the language of a statute makes its meaning obscure, it is the duty of the courts to construe, giving it a reasonable and sensible interpretation; but where the language is clear and unambiguous, it is only for the courts to obey and enforce it." *Crary* v. *Marquette Circuit Judge,* 197 Mich. 452.

"Statutes will be construed in the most beneficial way which their language will permit to prevent absurdity, hardship or injustice; to favor public convenience and to oppose all prejudice to public interests." 2 Lewis' Sutherland Statutory Construction (2d Ed.), § 490.

Mr. Justice WIEST said in *People* v. *Smith,* 246 Mich. 393, 396:

"We  *  *  *  would feel bound to accept a legislative definition, if indulged, even though at variance with common understanding and all lexicographers, but when the legislature employs a common term as indicative of the purpose of an enactment, without further definition or designation, we must let the term speak its ordinary sense."

In *Fox* v. *Standard Oil Co. of New Jersey,* 294 U. S. 87 (55 Sup. Ct. 333), decided January 14, 1935, Mr. Justice Cardozo said, in speaking of the

legislative definition of the word "store" in the West Virginia chain store act:

"There might be force in this suggestion if the statute had left the meaning of its terms to the test of popular understanding. Instead, it has attempted to secure precision and certainty by rejecting a test so fluid and indeterminate and supplying its own glossary. The goods offered for sale are to be understood as having reference to goods 'of any kind,' and the place at which the sale is made shall include not only places that in the common speech of men would be designated as stores, but, broadly speaking, any mercantile establishment, whether a store or something else. In such circumstances definition by the average man or even by the ordinary dictionary with its studied enumeration of subtle shades of meaning is not a substitute for the definition set before us by the law-makers with instructions to apply it to the exclusion of all others. Cf. *Midwestern Petroleum Corp.* v. *State Board of Tax Commissioners,* 206 Ind. 688 (187 N. E. 882). There would be little use in such a glossary if we were free in despite of it to choose a meaning for ourselves."

See, also, our recent views in *C. F. Smith Co.* v. *Fitzgerald,* 270 Mich. 659.

The troublesome words are "than for resale in the form of tangible personal property." Is that "form" the same or identical form as stated by appellants or "any form" as urged by appellees? The board at various times made contradictory interpretations. The legislature attempted to clarify by resolution, when it should have expressed its intention clearly in the first instance or by later amendment. It therefore becomes our duty, "as far as practicable, to reconcile the different provisions, so as to make them consistent and harmonious, and

to give a sensible and intelligent effect to each."
*Rohde* v. *Wayne Circuit Judge,* 168 Mich. 683. True,
the question here is with respect to the meaning of
the legislative definition of a "sale at retail," sec-
tion 1 (b. 1) and (b. 2). But section 28 reads:
"This act may be cited as the 'general sales tax
act.'" Section 23 provides:

"Advertising; reimbursement. No person en-
gaged in the business of selling tangible personal
property at retail shall advertise or hold out to
the public in any manner, directly or indirectly, that
the tax herein imposed is not considered as an ele-
ment in the price to the consumer. Nothing con-
tained in this act shall be deemed to prohibit any
taxpayer from reimbursing himself by adding to his
sale price any tax levied hereunder."

And section 1 (c) prohibits "any deduction on ac-
count of cost of the property sold, the cost of mate-
rials used, the cost of labor or services purchased,
amounts paid for interest or discounts, or any other
expenses whatsoever," etc.

We apprehend that the ambiguity of which com-
plaint is made is not in the language of the act it-
self, but in its applicability to some of the multi-
tudinous situations which are thereby affected. We
are aware that economists speak of "consumption
goods" and "production goods" (see 2 Palgrave's
Dictionary of Political Economy [1925 Ed.], p. 229),
but we are concerned with the ordinary meaning of
the words and should not resort to judicial legis-
lation.

To paraphrase Mr. Justice Day in *United States*
v. *First National Bank,* 234 U. S. 245 (34 Sup. Ct.
846): If the true construction be followed with
harsh consequences, it cannot influence the courts
in administering the law. The responsibility for

the justice or wisdom of legislation rests with the legislature, and it is the province of the courts to construe, not to make, the laws.

See, also, *Veazie Bank* v. *Fenno,* 8 Wall. (75 U. S.) 533, and *A. Magnano Co.* v. *Hamilton,* 292 U. S. 40 (54 Sup. Ct. 599).

The statute imposes a tax upon that which is consumed and used and exempts only that which is sold for resale; the basis of classification is the disposition of the goods made by the buyer, not the character of the business of the seller or buyer.

The present interpretation of the board is reasonable and sensible and renders the various provisions of the act consistent and harmonious. Any other interpretation might possibly (but we do not so hold, that question not being presented) contravene the uniformity clause (article 10, § 4) of our State Constitution (see *Winter* v. *Barrett* and *Stewart Dry Goods Co.* v. *Lewis, supra*), and it is presumed that the legislature intended to adopt a constitutional act.

The restricted nature of the matter presented upon appeal is only affected by a part of the decree of the trial court. It will, therefore, be modified to conform to this opinion and as so modified the decree will be affirmed. A public question being involved, no costs will be granted.

POTTER, C. J., and NELSON SHARPE, NORTH, FEAD, WIEST, BUTZEL, and EDWARD M. SHARPE, JJ., concurred.