*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TRUGREEN LIMITED PARTNERSHIP,

Plaintiff-Appellant,

FOR PUBLICATION
April 10, 2020

v

No. 344142
Court of Claims
LC No. 17-000141-MT

DEPARTMENT OF TREASURY,

Defendant-Appellee.

Before: SHAPIRO, P.J., and GLEICHER and SWARTZLE, JJ.

SHAPIRO, P.J. (*concurring*).

I concur fully in Judge Gleicher's opinion. I write separately only to address some aspects of the dissenting opinion. First, despite its fine prose, the dissent's analysis rests on a single point i.e., that the phrase "things of the soil" is not a term of art. I disagree. That phrase is plainly a term of art and patching together definitions of its individual component words is not consistent with proper statutory interpretation. Second, the dissent's approach would greatly expand the scope of this tax exemption beyond what it has been for 70 years. To accomplish that, I suggest that more than a dictionary is required. Third, the dissent does not give respectful consideration to the interpretation by the body charged with applying the statute.

## I. "THINGS OF THE SOIL" IS A TERM OF ART

The dissent rests on its assertion that interpretation of the statute at issue does not require "an effort to unearth the meaning of oft-obscure, technical language." To the contrary: the origin and meaning of the phrase "things of the soil" is most certainly obscure. I doubt that any member

of this Court has ever heard the phrase in conversation or even seen it in a book other than perhaps the Bible.[1]

A term of art has been defined as "a word or phrase that has a specific meaning or precise meaning within a given discipline or field and might have a different meaning in common usage."[2] Accordingly, we are to construe the term by its established use in the law, not by looking up the individual words in the dictionary. This not a new idea and is mandated by statute. MCL 8.3(a) provides that "[a]ll words and phrases shall be construed and understood according to the common and approved usage of the language; but *technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, **shall** be construed and understood according to such peculiar and appropriate meaning*." (Emphasis added).

Consistent with decades of caselaw, I conclude that the phrase "things of the soil" has an established meaning in Michigan law, i.e., crops grown for harvest and sale. Despite the dissent's confidence that every reasonable person would know that this phrase includes residential lawns, no case has even suggested such a reading in 70 years. Nor has any taxpayer—until this case—made such a claim.

## II. THE CONTEXT

The dissent reads the first sentence of the statute in isolation. For example, the second sentence does not refer to the "caring for horticulture" but to the "caring for horticultural products." MCL 205.94(1)(f). A product is an object that may be sold to another. TruGreen does not explain how the grass it cares for is a "product" and for good reason. With rare exceptions (which will likely fall within the exemption) private residential plants and lawns are not for sale. They are not "products." TruGreen does not care for something that will become a product. Rather it provides a service to residential property owners who would never qualify for the exemption themselves. Certainly "products" are used to care for the private lawn but no product, horticultural or otherwise is created.

Reading the rest of the statute leads to the same conclusion. The items specifically listed as falling within the exemption are:

- machinery capable of harvesting grain or other crops or biomass

---

[1] Some translations of Genesis 9:20 describe Noah, after the flood, as "a man of the soil," English Standard Version (2001); New International Version, (2011), while other translations describe him as a "farmer," New American Standard Bible (1995); New King James Version, (2020).

[2] <http://www.dictionary.com> (last accessed March 18, 2020). It is similarly defined elsewhere as "an expression or phrase that has a defined meaning when used in a particular context or knowledge environment." <http://www.justia.com/dictionary> (last accessed March 23, 2020).

- agricultural land tile or other drainage system "used in the production of agricultural products"
- portable grain bins
- grain drying equipment
- greenhouses. [MCL 205.94(1)(f).]

It would be highly unusual for a private residence to use "portable grain bins," "grain drying equipment" or any of the other items that were intended to fall within the exemption and exemplify its scope. And of course, the exemplar list does not include anything that would be particularly used to maintain a private lawn or garden.[3]

The dissent suggests that the Legislature could have made its intention regarding non-agricultural application of the exemption clear by including the terms "for agricultural purposes." This is a straw man argument—one could just as easily say that the Legislature could simply have added the phrase "including lawn care" or "including services to residential property."

III. THE DEPARTMENT'S INTERPRETATION

In my view, the agency has not overstepped its authority; rather, it has exercised its lawful authority to apply the law defining the scope of this particular tax exemption and has done so consistent with the statute. It is well-settled that "the construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration, and ought not to be overruled without cogent reasons." *Boyer-Campbell Co v Fry*, 271 Mich 282, 296; 260 NW 165 (1935) (quotation marks and citation omitted). Moreover,

> while not controlling, the practical construction given to doubtful or obscure laws in their administration by public officers and departments with a duty to perform under them is taken note of by the courts as an aiding element to be given weight in construing such laws, and is sometimes deferred to when not in conflict with the indicated spirit and purpose of the Legislature. [*Id*. at 296-297 (quotation marks and citation omitted).]

The Department's long-standing construction of the statute is not in conflict with "the indicated spirit and purpose" of the statute yet the dissent gives its construction no credence

---

[3] TruGreen and the dissent rely on *Mueller & Sons Inc v Dept of Treasury*, 189 Mich App 570 (1991)—the only case to apply the exemption to non-farmers. However, *Mueller* extended the exception to only one category of businesses—those that provide services to farms. The sole property for which the exemption was sought and granted was fertilizer equipment, which the petitioner used to perform "a contractual service *to farmers* for their application of fertilizer." *Id*. at 572 (emphasis added). It is one thing to apply the exemption to those who contract to do the work farmers would otherwise do themselves. See also *Michigan Milk Producers Ass'n v Dept' of Treasury*. 242 Mich App 486; 618 NW2d 917 (2000). It is quite another to apply it to every company whose work involves anything that is found in soil.

whatsoever, let alone respectful consideration.  The dissent reads as though interpretation of this statute did not exist prior to the time its author picked up the dictionary.[4]

## IV.  JURISPRUDENCE BY DICTIONARY

The use of dictionaries as sources of law is a very recent phenomenon.  For 140 years, from 1845 through 1984, the Michigan Supreme Court cited to a lay dictionary in less than 1% of its cases.   From 1985 through 1994, it cited to lay dictionaries in about 8% of cases and from 1995 to 2005 (as the "textualist" era began) in 14%.  Since then there has been an explosion in reliance on the dictionary; from 2005 to the present, the Court has cited lay dictionaries in an astonishing 37% of cases.[5]  More Supreme Court cases were decided using lay dictionaries in the era since 2000 than in the entire 155 years that preceded it.

This explosion in courts' use of dictionaries has occurred in the face of intense criticism from legal scholars, language experts, and even dictionary editors.  Critics point out that it allows for dictionary shopping and cherry-picking;[6] that it is inconsistent with language theory; and that

---

[4] I am not impressed by the dissent's view of the legislative history.  First the dissent reminds us that legislative history is of no moment; only the literal text of the statute matters.  Then, the dissent reverses course and speculates at length about the motives of the Legislature through a number of revisions over decades.  The dissent's bottom line, however, is that by adopting the phrase "things of the soil" in 1949 the Legislature unambiguously intended to allow the exemption to apply beyond farming; an intent that eluded discovery for nearly 70 years.

[5] From preliminary data supplied by Professor Joseph Kimble for a work in progress. The cases do not include orders.

[6] There are many dictionaries and each assign multiple meanings to most words.  This invites judges to "cherry pick" the definition that suits their position and ignore the others.  For example, the dissent cites the definition of "thing" in the *Oxford English Dictionary* (1933) and asserts that it is defined as "[a]pplied (usually with a qualifying word) to a living being or creature; occasionally to a plant."  Here the dissent is clearly cherry-picking.  First, the definition refers to "a living being or creature," which if relied on would mean that earthworms, voles, and other creatures must also be considered "things of the soil," a view the dissent rejects without explanation.  Second, the dissent reads as if its selected definition is the only one in the *OED*.  To the contrary, the definitions of "thing" in the 1933 *OED* runs to over two full pages in a font so small as to be barely readable.  Thus, the definition underlying the dissent's entire analysis has been picked not merely from one cherry tree, but from an entire orchard.  Some examples of the definitions not mentioned in the dissent include "a being without life or consciousness; an inanimate object," "a piece of property," "an event, occurrence, incident," "a material substance," "what is proper," "that with which one is concerned," "that which is to be done," "an entity of any kind," "a being or entity consisting of matter, or occupying space" and many, many others.  Moreover, there is a section for the use of the word "thing" in "phrases, special collocation, and combinations," yet the phrase "things of the soil" is not defined there.

legislative drafters themselves apparently do not rely on dictionaries to any great extent.[7]  The authors of one exhaustive study of United States Supreme Court opinions concluded that "the image of dictionary usage as . . . authoritative is little more than a mirage."[8]

Nevertheless, jurisprudence by dictionary remains tempting; it requires no effort beyond looking up a few words and picking the definition that support the author's position.  More insidiously, it implies that reasoned good-faith discussion, analysis of caselaw and context, and stare decisis are not aids to interpretation, but rather stumbling blocks on the path to the absolute clarity that can only be provided by a dictionary.  Dictionary usage has become a fetish by which reasoned analysis, criticism, and concern for actually existing conditions are rendered irrelevant to the judicial process.  Despite the ease of deciding cases by dictionary, the question is what the intent of the Legislature was, not what the intent of a dictionary editor is.  The Legislature has no official dictionary and has not commanded us to conclusively rely on a particular, or indeed any, dictionary in order to understand its intent.

The fetishization of dictionaries has even led thoughtful jurists like our dissenting colleague to conclude that any attempt by the courts to interpret a statute by means other than a dictionary is "outside of our proper role and competency."  Such an approach dispenses with the constitutional fact that the judiciary is an independent co-equal branch of government and ultimately responsible for the interpretation of statutes and their fair application in individual cases.[9] The judiciary is not subservient to the editors of dictionaries and the dictionary is not established by our constitution as the guiding force in jurisprudence. I suggest that it is time we put the dictionary back on the shelf and resume our constitutional role.

/s/ Douglas B. Shapiro

---

[7] See e.g., Kimble, *What the Michigan Supreme Court Wrought in the Name of Textualism and Plain Meaning: A Study of Cases Overruled, 2000–2015*, 62 Wayne L Rev 347, 359–60 (2017) (summarizing, with references, some of the grounds for criticism).  See also Aprill*, The Law of the Word: Dictionary Shopping in the Supreme Court*, 30 Ariz St L J 275, 334 (1998) ("[Dictionaries'] purpose of giving readers and speakers approximate meanings of words so that they begin to understand the meaning of the word in context makes dictionaries ill-suited for determining the meaning of a particular word in a particular statute."); Hoffman, *Parse the Sentence First: Curbing the Urge to Resort to the Dictionary When Interpreting Legal Texts,* 6 NYU J Legislation & Public Policy 401, 401 (2003) ("[J]ust as medical science has progressed since the time of leech treatments, the science of linguistics has progressed since the time that scholars believed that dictionaries held the key to sentence meaning. Dictionaries simply are not capable of explaining complex linguistic phenomena, but they are seductive.").

[8] Brudney & Baum, *Oasis or Mirage: The Supreme Court's Thirst for Dictionaries in the Rehnquist and Roberts Eras*, 55 Wm & Mary L Rev 483, 492 (2013).

[9] "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule." *Marbury v Madison*, 5 US 137, 177; 2 L Ed 60 (1803).