*In re* APPLICATION OF INDIANA MICHIGAN POWER COMPANY TO INCREASE RATES

*In re* APPLICATION OF CONSUMERS ENERGY COMPANY TO INCREASE RATES

Docket Nos. 299590 and 299591. Submitted February 8, 2012, at Lansing. Decided July 10, 2012, at 9:05 a.m. Leave to appeal denied, 493 Mich 946.

Indiana Michigan Power Company and Consumers Energy Company filed separate applications with the Public Service Commission (PSC) seeking the authority to amend their electric rates in order to increase annual revenue. The PSC issued orders holding that the petitioners could self-implement temporary rate increases by increasing rates according to certain percentages with the percentages varied for different classes of ratepayers instead of applying equal-percentage increases to all base rates. The Attorney General appealed by right the PSC's orders with regard to both Indiana Michigan Power (Docket No. 299590) and Consumers Energy (Docket No. 299591), arguing that equal-percentage increases for all base rates were required. The Court of Appeals consolidated the cases.

The Court of Appeals *held*:

1. A moot issue will be reviewed if it is publically significant, likely to recur, and yet likely to evade judicial review. Although the PSC had set final rates with respect to both utilities, arguably rendering the issue moot, the issue was publically significant, likely to recur, and likely to evade judicial review and, thus, could be reviewed.

2. An electric utility may not increase its rates and charges or alter, change, or amend any rate or rate schedules, the effect of which will be to increase the cost of services to its customers, without first receiving approval from the PSC. However, under MCL 460.6a(1), a utility is afforded the right to self-implement an interim rate increase through equal-percentage increases or decreases applied to all base rates six months after filing a complete application if the PSC has not issued an order. Rather than requiring PSC approval, the PSC is relegated to issuing a temporary order preventing or delaying the interim increase if there is

good cause. Under MCL 460.11(1), beginning January 1, 2009, the PSC was required to phase in electric rates equal to the cost of providing service to each customer class over a period of five years from the effective date of 2008 PA 286. The PSC determined that if the self-implemented rates were of equal percentages for all base rates, it would frustrate the mandate in § 11(1) to phase in cost-based rates. Pursuant to § 6a(1), if a utility self-implements interim rate increases before the PSC issues a final order, the utility must use an equal-percentage surcharge. But the orders issued by the PSC in these cases were consistent with the PSC's authority to issue cost-based rates and with the legislative mandate to phase in cost-based rates. To fulfill its obligation to phase in cost-based rates, the PSC has the necessary authority to gradually implement the cost-based rates through approval of varying rate adjustments. However, after the five-year phase-in period, the PSC will be barred from preventing or delaying self-implementation of equal-percentage rate increases except for good cause.

Affirmed.

MURRAY, J., dissenting, disagreed with the majority's decision to affirm, concluding that the statutory language was dispositive. Under MCL 460.6a(1), if the PSC does not issue a final rate order within 180 days of the application being filed, a utility is permitted to implement a temporary rate increase up to the amount of the proposed annual rate request through equal-percentage increases or decreases applied to all base rates. Once this rate change occurs, the PSC is powerless to stop it unless it finds good cause to do so. Because the PSC did not issue a final order within 180 days of either petitioner's application, nor did it find good cause to prevent or delay the temporary rate changes, the PSC's orders were illegal. Enforcement of MCL 460.6a(1) does nothing to interfere with the PSC's cost-based rate phase-in obligation under MCL 460.11(1) because the PSC can ensure that the rates established in final orders meet the cost-based rate requirements of § 11(1). If allowing these temporary rate increases by the utilities does interfere with the PSC's obligation under § 11(1), nothing prohibits the PSC from using that reason for establishing good cause to prohibit the temporary rate increases under MCL 460.6a(1).

PUBLIC UTILITIES — INTERIM RATE INCREASES — PUBLIC SERVICE COMMISSION.

A utility may self-implement an interim rate increase through equal-percentage increases or decreases applied to all base rates six months after filing a complete application for a rate change

with the Public Service Commission (PSC); the PSC is relegated to issuing a temporary order preventing or delaying the interim increase if there is good cause; the PSC is required to phase in electric rates equal to the cost of providing service to each customer class over a period of five years from the effective date of 2008 PA 286; if a utility self-implements interim rate increases before the PSC issues a final order, the utility must use an equal-percentage surcharge; but in order to fulfill its obligation to phase in cost-based rates, the PSC has the necessary authority to gradually implement cost-based rates through approval of interim varying-percentage rate adjustments; after the five-year phase-in-period, the PSC will be barred from preventing or delaying self-implementation of equal-percentage rate increases except for good cause.

*Warner Norcross & Judd LLP* (by *Richard J. Aaron*) for Indiana Michigan Power Company.

*Bill Schuette*, Attorney General, and *S. Peter Manning* and *Donald E. Erickson*, Assistant Attorneys General, for the Attorney General in *Indiana Michigan Power*.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, and *Steven D. Hughey* and *Anne M. Uitvlugt*, Assistant Attorneys General, for the Public Service Commission in *Indiana Michigan Power*.

*Jon R. Robinson*, *H. Richard Chambers*, and *Eric V. Luoma* for Consumers Energy Company.

*Bill Schuette*, Attorney General, and *S. Peter Manning*, *Michael E. Moody*, and *Donald E. Erickson*, Assistant Attorneys General, for the Attorney General in *Consumers Energy*.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, and *Steven D. Hughey* and *Spencer A. Sattler*, Assistant Attorneys General, for the Public Service Commission in *Consumers Energy*.

Before: FITZGERALD, P.J., and WILDER and MURRAY, JJ.

FITZGERALD, P.J. In Docket No. 299590, the Michigan
Public Service Commission ("PSC" or "the Commis-
sion") issued an order holding that Indiana Michigan
Power Company ("Indiana Michigan") could self-
implement a temporary rate increase by applying dif-
ferent percentage increases to different base rates in-
stead of applying equal-percentage increases to all base
rates as provided for by MCL 460.6a(1). In Docket No.
299591, the PSC issued an order holding that Consum-
ers Energy Company ("Consumers Energy") could also
self-implement a temporary rate increase using varying
percentage increases for different base rates. The At-
torney General appeals by right in both cases, arguing
that equal-percentage increases for all base rates were
required. We affirm.

MCL 460.6a(1) provides in relevant part:

> A gas or electric utility shall not increase its rates and
> charges or alter, change, or amend any rate or rate sched-
> ules, the effect of which will be to increase the cost of
> services to its customers, without first receiving commis-
> sion approval as provided in this section. . . . The commis-
> sion shall notify the utility within 30 days of filing, whether
> the utility's petition or application is complete. . . . If the
> application is not complete, the commission shall notify the
> utility of all information necessary to make that filing
> complete. If the commission has not notified the utility
> within 30 days of whether the utility's petition or applica-
> tion is complete, the application is considered complete. *If
> the commission has not issued an order within 180 days of
> the filing of a complete application, the utility may imple-
> ment up to the amount of the proposed annual rate request
> through equal percentage increases or decreases applied to
> all base rates.* For a petition or application pending before
> the commission prior to the effective date of the amenda-
> tory act that added this sentence, the 180-day period

commences on the effective date of the amendatory act that added this sentence. If the utility uses projected costs and revenues for a future period in developing its requested rates and charges, the utility may not implement the equal percentage increases or decreases prior to the calendar date corresponding to the start of the projected 12-month period. *For good cause, the commission may issue a temporary order preventing or delaying a utility from implementing its proposed rates or charges.* If a utility implements increased rates or charges under this subsection before the commission issues a final order, that utility shall refund to customers, with interest, any portion of the total revenues collected through application of the equal percentage increase that exceed the total that would have been produced by the rates or charges subsequently ordered by the commission in its final order. [Emphasis added.]

This version of § 6a(1) was enacted by 2008 PA 286, which also added § 11(1), MCL 460.11(1). Section 11(1) provides:

This subsection applies beginning January 1, 2009. Except as otherwise provided in this subsection, the commission shall phase in electric rates equal to the cost of providing service to each customer class over a period of 5 years from the effective date of the amendatory act that added this section. If the commission determines that the rate impact on industrial metal melting customers will exceed the 2.5% limit in subsection (2), the commission may phase in cost-based rates for that class over a longer period. The cost of providing service to each customer class shall be based on the allocation of production-related and transmission costs based on using the 50-25-25 method of cost allocation. The commission may modify this method to better ensure rates are equal to the cost of service if this method does not result in a greater amount of production-related and transmission costs allocated to primary customers.

In these cases, the PSC determined that interim, self-implemented, equal-percentage increases would frus-

trate the phase-in of cost-based rates. Accordingly, it allowed for interim, self-implemented rate increases but required that they be of varying percentages for different base rates.

### I. THE FACTS

#### A. INDIANA MICHIGAN

On January 27, 2010, Indiana Michigan filed an application seeking authority to amend its electric rates to increase annual jurisdictional operating revenues by approximately $62.5 million. Noting that a self-implemented rate increase could be applied as of July 26, 2010, in the absence of an order preventing or delaying self-implementation for good cause, the PSC issued an order on April 13, 2010, in which it determined that it needed information on the new rates before it could make a decision on such an order. It therefore directed Indiana Michigan to file the tariffs it proposed to implement during the interim period. Further, it required that a witness "support the reasonableness of the proposed tariffs and . . . provide evidence regarding the effect of the statutory rate design option [i.e., equal percentage increases or decreases applied to all base rates] and reasonable alternatives thereto." David M. Roush, the Director of Regulated Pricing and Analysis at Indiana Michigan's parent company, subsequently explained that Indiana Michigan was proposing to apply a surcharge rider to existing tariffs and rates that would apply as a percentage of the total monthly charges under the existing rates. With certain exclusions, the applicable percentage was to vary by tariff and would maintain the same relationships as the requested first-year rate increase. While this was inconsistent with § 6a(1), Roush noted that a uniform percentage increase would significantly raise the increases

for some classes; he asserted that the proposed increases would be consistent with § 11(1).

The PSC adopted the alternative proposed by Roush. It noted that in a May 12, 2009 order in an unrelated case, *In re Application of Consumers Energy Co* (PSC Case No. U-15645), it had previously ruled as follows:

> Public Act 286 of 2008 contains two conflicting sections (Section 6a(1) and Section 11(1)) regarding rate design which require reconciliation by the Commission. In the present filing, this conflict would result in a percentage increase for some rate classes that is greater than what Consumers proposes for its final rate structure, including rate classes that have been identified as having rates in excess of the cost of providing service. Although the Act provides for a refund of amounts charged that are greater than what is approved in the final order, the rate refund mechanism may not necessarily result in a refund that equals the amount of any overcharge for these identified rate classes. This result would be in direct conflict with the Commission's statutory mandate under Section 11(1).
>
> *       *       *
>
> Statutes that relate to the same subject are *in pari materia* and are thus read together, even if each provision does not reference the other. *Michigan Electric Cooperative Ass'n v Public Service Comm*, 267 Mich App 608, 616; 705 NW2d 709 (2005). The goal of statutory interpretation remains that of discerning and applying the Legislature's intent as expressed in the words of the statute. *Id*.
>
> In reaching this conclusion, the Commission is mindful of its duty to the public interest. It thus understands Section 6a(1) as addressing situations in which existing rate classes are not subject to structural realignments of the kind explicitly required in Section 11(1). The Commission does not accept the conclusion that the Legislature intended to create a scheme in the statute to produce outcomes that, as ABATE suggests, could verge upon the absurd. This is illustrated by the present case, in which

> Consumers' proposal, as is, would produce volatile rate
> swings from existing rates to self-implemented rates to the
> rates implemented by the final order. It would require
> commercial and industrial customers to absorb millions of
> dollars in temporary rate hikes, with no apparent cost
> justification, at a time when Michigan's business climate is
> a matter of national focus. Such an outcome would be far
> removed from any reasonable person's conception of the
> public interest.

In the Indiana Michigan case, the PSC similarly con-
cluded "that a rate change based on an equal percent-
age increase would lead to a result where [Indiana
Michigan's] rates became more, rather than less,
skewed."

### B. CONSUMERS ENERGY COMPANY

On January 22, 2010, Consumers Energy filed an
application seeking authorization to increase its electric
rates to produce additional revenues of approximately
$178 million annually. The PSC again directed the
utility to file the tariffs it proposed to self-implement
and to produce a witness "to support the reasonable-
ness of the proposed tariffs and . . . provide evidence
regarding the effect of the statutory rate design option
and reasonable alternatives thereto." Ronn J. Rasmus-
sen, Vice President of Rates and Regulation at Consum-
ers Energy, testified that the Company was intending to
self-implement increases by imposing "interim sur-
charges that were calculated based upon the equal
percentage increase approach specified in MCL
460.6a(1)." Rasmussen considered a self-implemented
rate design that would have used varying rates, but
testified that the first approach was preferred because
it complied with § 6a(1) and using an equal-percentage
increase would postpone until the final order Commis-
sion decisions regarding the appropriate cost-of-service

allocation and corresponding rate design. The PSC rejected this proposal. For the same reasons set forth in its decision in the Indiana Michigan case, it held that the self-implemented rates should vary from rate class to rate class.

## II. MOOTNESS

Indiana Michigan argues that the appeal is moot because, following a settlement agreement, the PSC issued a final order setting Indiana Michigan's final rates on October 14, 2010. Moreover, a final rate was set with respect to Consumers Energy by an order entered on November 4, 2010. However, a moot issue will be reviewed if it is publicly significant, likely to recur, and yet likely to evade judicial review. *Attorney General v Pub Serv Comm*, 269 Mich App 473, 485; 713 NW2d 290 (2006). Because the issue involves rates charged to a multitude of consumers, it is publicly significant. Moreover, because the issue may arise when rate increases are sought through 2013, and such requests are likely, it is likely to recur. Because the PSC must issue final orders on rates within one year, the issue would likely evade review. Final rates would presumably be set in most if not all instances before the issue wends its way through the appellate process. Accordingly, we will address the issue.

## III. STANDARD OF REVIEW

This is a rate case, but resolution of the issue on appeal turns on the validity of the PSC's interpretation of §§ 6a(1) and 11(1). In *In re Application of Consumers Energy Co for Rate Increase*, 291 Mich App 106, 109-110; 804 NW2d 574 (2010), the Court stated:

> The standard of review for PSC orders is narrow and well defined. Pursuant to MCL 462.25, all rates, fares,

charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. See also *Mich Consol Gas Co v Pub Serv Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of proving by clear and convincing evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a statutory requirement or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999). A reviewing court gives due deference to the PSC's administrative expertise, and should not substitute its judgment for that of the PSC. *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999).

A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *In re Application of Consumers Energy Co*, 279 Mich App 180, 188; 756 NW2d 253 (2008). Whether the PSC exceeded the scope of its authority is a question of law that is reviewed de novo. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003).

The standard of review for an agency's interpretation of a statute was recently set forth in *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 103; 754 NW2d 259 (2008), quoting *Boyer-Campbell v Fry*, 271 Mich 282, 296-297; 260 NW 165 (1935):

"[T]he construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons. However, these are not binding on the courts, and [w]hile not controlling, the practical construction given to doubtful or obscure laws in their administration by public officers and departments with a duty to perform under them is taken note of by the courts as an aiding element to be given weight in construing such laws

and is sometimes deferred to when not in conflict with the indicated spirit and purpose of the legislature."

This standard requires "respectful consideration" and "cogent reasons" for overruling an agency's interpretation. Furthermore, when the law is "doubtful or obscure," the agency's interpretation is an aid for discerning the Legislature's intent. However, the agency's interpretation is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue. [Second alteration in original.]

IV. ANALYSIS

The PSC properly construed § 11(1) as giving it authority to issue an order allowing the utilities to self-implement an interim rate on something other than an equal percentage basis as part of the phase-in of cost-based rates.

Before the adoption of 2008 PA 286, § 6a(1) provided that when a utility sought a rate increase, it could move for partial and immediate relief, which the PSC could grant in its discretion after providing notice to interested parties and the opportunity for a full and complete hearing. See MCL 460.6a(1) as amended by 1992 PA 37. The new version of § 6a(1) changes this procedure in part by affording a utility the right to self-implement an interim rate after six months; the PSC is then relegated to issuing a temporary order preventing or delaying the interim increase if there is good cause.

In the present cases, the PSC determined that the right to self-implement interim increases in rates would be triggered because it would not be able to make a determination on a final rate within 180 days. It therefore sought information from which it could make a good-cause determination. However, it did not determine that there was good cause for delaying or preventing self-implementation. Rather, it determined that

self-implementation could go forward, but it precluded
the utilities from using equal-percentage increases for
all rates.

> The PSC possesses no common-law powers. It is a
> creature of the Legislature, and all of its authority must be
> found in statutory enactments. *Union Carbide Corp v
> Public Service Comm*, 431 Mich 135, 146; 428 NW2d 322
> (1988). A statute that grants power to an administrative
> agency is to be strictly construed. *Miller Bros[ v Pub Serv
> Comm*, 180 Mich App 227, 232; 446 NW2d 640 (1989)].
> Administrative authority must be plainly granted, for
> doubtful power in this context does not exist. *Id*. [*Attorney
> General v Pub Serv Comm*, 231 Mich App 76, 78; 585 NW2d
> 310 (1998)].

Section 6a(1) did not authorize the PSC to take this
action. While it allowed prevention or delay of self-
implementation for good cause, it did not authorize
self-implementation using varying percentages for dif-
ferent rates. Thus, the PSC must have had some other
grant of power that would authorize it to make this
ruling. The only authority cited is § 11(1).

The PSC concluded that § 6a(1) conflicted with
§ 11(1) and that the two statutes had to be read *in pari
materia*. In *Robinson v City of Lansing*, 486 Mich 1, 8
n 4; 782 NW2d 171 (2010), quoting *Dearborn Twp Clerk
v Jones*, 335 Mich 658, 662; 57 NW2d 40 (1953), the
Court stated, " 'It is elementary that statutes *in pari
materia* are to be taken together in ascertaining the
intention of the legislature, and that courts will regard
all statutes upon the same general subject matter as
part of 1 system.' " Stated differently, " '[s]tatutes that
address the same subject or share a common purpose
are *in pari materia* and must be read together as a
whole' to fully reveal the Legislature's intent." *Bush v
Shabahang*, 484 Mich 156, 191; 772 NW2d 272 (2009)
(MARKMAN, J., dissenting), quoting *People v Harper*, 479

Mich 599, 621; 739 NW2d 523 (2007). However, "the interpretive aid of the doctrine of in pari materia can only be utilized in a situation where the section of the statute under examination is itself ambiguous." *Tyler v Livonia Pub Sch*, 459 Mich 382, 392; 590 NW2d 560 (1999), citing *Voorhies v Faust*, 220 Mich 155, 157; 189 NW 1006 (1922). "If two statutes lend themselves to a construction that avoids conflict, that construction should control." *In re Project Cost & Special Assessment Roll for Chappel Dam*, 282 Mich App 142, 148; 762 NW2d 192 (2009). In *Mich Basic Prop Ins Ass'n v Office of Fin & Ins Regulation*, 288 Mich App 552, 559-560; 808 NW2d 456 (2010), the Court summarized:

> A statutory provision is ambiguous if it irreconcilably conflicts with another provision or when it is equally susceptible to more than one meaning. *Fluor Enterprises, Inc v Dep't of Treasury*, 477 Mich 170, 177-178 n 3; 730 NW2d 722 (2007). A statutory provision should be viewed as ambiguous only after all other conventional means of interpretation have been applied and found wanting. *Id.* at 178 n 3. If a statute is ambiguous, judicial construction is appropriate. *Capitol Props Group, LLC v 1247 Ctr Street, LLC*, 283 Mich App 422, 434; 770 NW2d 105 (2009). "Where the language of a statute is of doubtful meaning, a court must look to the object of the statute in light of the harm it is designed to remedy, and strive to apply a reasonable construction that will best accomplish the Legislature's purpose." *Marquis v Hartford Accident & Indemnity (After Remand)*, 444 Mich 638, 644; 513 NW2d 799 (1994). When construing statutes, the terms of statutory provisions with a common purpose should be read *in pari materia*. *World Book, Inc v Dep't of Treasury*, 459 Mich 403, 416; 590 NW2d 293 (1999). The objective of this rule is to give effect to the legislative purpose as found in statutes addressing a particular subject. *Id.* "Conflicting provisions of a statute must be read together to produce an harmonious whole and to reconcile any inconsistencies wherever possible." *Id.*

When construing a statute, "a court should not abandon the canons of common sense." *Marquis*, 444 Mich at 644. "We may not read into the law a requirement that the lawmaking body has seen fit to omit." *In re Hurd-Marvin Drain*, 331 Mich 504, 509; 50 NW2d 143 (1951). When the Legislature fails to address a concern in the statute with a specific provision, the courts "cannot insert a provision simply because it would have been wise of the Legislature to do so to effect the statute's purpose." *Houghton Lake Area Tourism & Convention Bureau v Wood*, 255 Mich App 127, 142; 662 NW2d 758 (2003). Therefore, when necessary to interpret an ambiguous statute, the appellate courts must determine the reasonable construction that best effects the Legislature's intent. *Id.*

The PSC concluded that if the self-implemented rates were of equal percentages for all base rates, it would frustrate the mandate in § 11(1) to phase in cost-based rates. Concluding that the Legislature would not have intended absurd results, the PSC determined that § 6a(1) addressed "situations in which existing rate classes are not subject to structural realignments of the kind explicitly required in Section 11(1)." The PSC appears to mean that the requirement in § 6a(1) for equal-percentage rate increases was intended to come into play once the phase-in-period was complete and cost-based rates were being charged; after that point, application of an equal-percentage rate increase would not lead to more skewing.

There is a potential conflict between the authority granted to the PSC in § 6a(1) and the authority granted to it in § 11(1). Section 6a(1) expressly allows the PSC to prevent or delay self-implementation of equal-percentage rate increases for good cause, whereas § 11(1) gives it a general grant of authority to phase in cost-based rates over five years. To the extent § 11(1) is exercised in a way that is inconsistent with § 6a(1) such that it authorizes the PSC to allow self-implementation

of something other than an equal-percentage rate increase, a conflict regarding the grant of authority to the PSC arises. Given that both statutes were enacted by 2008 PA 286 and address ratemaking, the provisions must be read *in pari materia* to discern the intent of the Legislature.

Section 6a(1) provides that *the utility* "*may* implement up to the amount of the proposed annual rate request through equal percentage increases or decreases applied to all base rates" *if* the Commission "has not issued an order within 180 days of the filing of a complete application . . . ." [Emphasis added.] Nothing in this section *requires* the utility to self-implement equal-percentage rate increases or decreases, and nothing in this section requires *the Commission,* acting pursuant to § 11(1), to order an equal-percentage surcharge. Rather, § 6a(1) merely provides that, if the utility self-implements interim rate increases before the Commission issues a final order, under those circumstances, *the utility* must use an equal-percentage surcharge.

In these cases, the Commission did not stop self-implementation by Indiana Michigan and Consumers Energy, but instead directed that, if the utilities decided to self-implement rate increases (in other words, to implement rate increases before a final order), they had to do so using cost-based rates. These orders were consistent both with the authority to issue cost-based rates granted to the Commission under § 11(1) and also with the legislative mandate that "the commission *shall* phase in electric rates equal to the cost of providing service to each customer class over a period of 5 years . . . ." MCL 460.11(1) (emphasis added). Moreover, nothing in the plain language of § 11(1) limits the

Commission's obligation to impose cost-based rates to rates established in final orders.

We find no cogent reason for concluding that the PSC erred by interpreting the statute to mean that § 11(1) granted it overriding authority for the five-year phase-in period. Section 6a(1) is a statute that will presumably be in effect long after the authority in § 11(1) is exhausted. When § 6a(1) stands alone, the PSC will be barred from preventing or delaying self-implementation of equal-percentage rate increases except for good cause. However, during the phase-in-period the PSC has authority to gradually bring about cost-based rates; use of the phrase "phase in" suggests that a gradual approach was desired. Roush indicated that if Indiana Michigan applied equal-percentage rate increases for the interim period it would "slightly reduce the increases for classes that require above average increases to move toward cost of service [and] raise[] significantly the increases for other classes." Rasmussen advocated an equal-percentage approach, believing the phase-in issue could be addressed in the final rate order, but his testimony suggests similar fluctuations would occur. Thus, all during the course of a single year, the existing rate would be in place, six months later an interim rate would be applied that would be further at odds with cost-based rates, and then ultimately rates closer to cost-based rates would be imposed, albeit with a refund of revenues collected through application of the equal-percentage rate increase. Then the same scenario would occur in the subsequent year if another rate increase were sought. While these spikes and valleys in rates could be addressed with refunds at the end of the rate year, they would not be consistent with a gradual implementation of cost-based rates. Section 11(1) was enacted with the intent of bringing about a specified change within five

years. The PSC's determination that varying percent-
age rate increases during that five years will allow it to
better meet its mission of phasing in the change is
consistent with the grant of authority in § 11(1). While
this is greater than the authority conferred on the PSC
by § 6a(1), the provisions, when read together, suggest
that such flexibility was intended for the phase-in-
period. Thus, we conclude that the grant of authority in
§ 11(1) to "phase in" cost-based rates over a five-year
period gave the PSC broad authority to accomplish the
phase-in in a fluid manner. Thus, the PSC could ma-
nipulate the interim, self-implemented rate for the
five-year phase-in-period to the extent such manipula-
tion would be consistent with the gradual implementa-
tion of cost-based rates.

Affirmed.

WILDER, J., concurred with FITZGERALD, P.J.

MURRAY, J. (*dissenting*). The single issue presented to
this Court for resolution is whether the Michigan
Public Service Commission properly exercised its au-
thority under MCL 460.6a(1) and MCL 460.11(1). Reso-
lution of that issue depends on what authority was
given to the commission under those statutes. As dis-
cussed below, because it is undisputed that the commis-
sion did not make a finding of good cause under MCL
460.6a(1), it was without authority to issue the interim
orders, and so I dissent from the majority's decision to
affirm.

The statutory language contained within these two
sections is dispositive of this issue. First is MCL
460.6a(1), which in part addresses a utility's ability to
implement temporary rate increases if the commission
fails to issue a final order within 180 days of the filing

of a complete application with the commission. MCL
460.6a(1) provides, in pertinent part:

> A gas or electric utility shall not increase its rates and
> charges or alter, change, or amend any rate or rate sched-
> ules, the effect of which will be to increase the cost of
> services to its customers, without first receiving commis-
> sion approval as provided in this section. The utility shall
> place in evidence facts relied upon to support the utility's
> petition or application to increase its rates and charges, or
> to alter, change, or amend any rate or rate schedules. The
> commission shall require notice to be given to all interested
> parties within the service area to be affected, and all
> interested parties shall have a reasonable opportunity for a
> full and complete hearing. A utility may use projected costs
> and revenues for a future consecutive 12-month period in
> developing its requested rates and charges. The commis-
> sion shall notify the utility within 30 days of filing, whether
> the utility's petition or application is complete. A petition
> or application is considered complete if it complies with the
> rate application filing forms and instructions adopted un-
> der subsection (6). A petition or application pending before
> the commission prior to the adoption of filing forms and
> instructions pursuant to subsection (6) shall be evaluated
> based upon the filing requirements in effect at the time the
> petition or application was filed. If the application is not
> complete, the commission shall notify the utility of all
> information necessary to make that filing complete. If the
> commission has not notified the utility within 30 days of
> whether the utility's petition or application is complete, the
> application is considered complete. *If the commission has
> not issued an order within 180 days of the filing of a
> complete application, the utility may implement up to the
> amount of the proposed annual rate request through equal
> percentage increases or decreases applied to all base rates.*
> For a petition or application pending before the commis-
> sion prior to the effective date of the amendatory act that
> added this sentence, the 180-day period commences on the
> effective date of the amendatory act that added this sen-
> tence. If the utility uses projected costs and revenues for a
> future period in developing its requested rates and charges,

the utility may not implement the equal percentage increases or decreases prior to the calendar date corresponding to the start of the projected 12-month period. *For good cause, the commission may issue a temporary order preventing or delaying a utility from implementing its proposed rates or charges. If a utility implements increased rates or charges under this subsection before the commission issues a final order, that utility shall refund to customers, with interest, any portion of the total revenues collected through application of the equal percentage increase that exceed the total that would have been produced by the rates or charges subsequently ordered by the commission in its final order.* The commission shall allocate any refund required by this section among primary customers based upon their pro rata share of the total revenue collected through the applicable increase, and among secondary and residential customers in a manner to be determined by the commission. The rate of interest for refunds shall equal 5% plus the London interbank offered rate (LIBOR) for the appropriate time period. For any portion of the refund which, exclusive of interest, exceeds 25% of the annual revenue increase awarded by the commission in its final order, the rate of interest shall be the authorized rate of return on the common stock of the utility during the appropriate period. Any refund or interest awarded under this subsection shall not be included, in whole or in part, in any application for a rate increase by a utility. Nothing in this section impairs the commission's ability to issue a show cause order as part of its rate-making authority. [Emphasis added.]

The other subsection at issue, MCL 460.11(1), requires that the commission phase-in, over a five-year period, electric rates based on the cost of providing service to each customer class:

This subsection applies beginning January 1, 2009. *Except as otherwise provided in this subsection, the commission shall phase in electric rates equal to the cost of providing service to each customer class over a period of 5 years from the effective date of the amendatory act that added this section.* If the commission determines that the

rate impact on industrial metal melting customers will exceed the 2.5% limit in subsection (2), the commission may phase in cost-based rates for that class over a longer period. The cost of providing service to each customer class shall be based on the allocation of production-related and transmission costs based on using the 50-25-25 method of cost allocation. The commission may modify this method to better ensure rates are equal to the cost of service if this method does not result in a greater amount of production-related and transmission costs allocated to primary customers. [Emphasis added.]

In determining the meaning of this statutory language, we are guided by our recent explication of statutory construction principles in the context of an administrative appeal set forth in *Mich Farm Bureau v Dep't of Environmental Quality*, 292 Mich App 106, 129-130; 807 NW2d 866 (2011):

> The construction of a statute by a state administrative agency charged with administering it " 'is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons.' " *In re Complaint of Rovas*, 482 Mich [90,] 103 [754 NW2d 259 (2008)], quoting *Boyer-Campbell Co v Fry*, 271 Mich 282, 296; 260 NW 165 (1935). Even so, " '[r]espectful consideration' is not equivalent to any normative understanding of 'deference' as the latter term is commonly used . . . ." *In re Complaint of Rovas*, 482 Mich at 108. Indeed, an administrative agency's interpretation "is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue." *Id.* at 103; see also *Ins Institute of Mich* [*v Comm'r of the Office of Fin & Ins Servs*], 486 Mich [370,] 385 [785 NW2d 67 (2010)]. Thus, even a longstanding administrative interpretation cannot overcome the plain language of a statute. *Kinder Morgan Michigan, LLC v City of Jackson*, 277 Mich App 159, 173; 744 NW2d 184 (2007).

Thus, if the statutes contain plain and unambiguous language, we cannot give even "respectful consider-

ation" to the commission's view on what the statutes require, for it is the judicial branch's role to enforce the clear and unambiguous statutory language.

The answer to the question is clear when enforcing the plain and unambiguous language of these statutes. Under MCL 460.6a(1), if the commission does not issue a final rate order within 180 days of the application being filed, a utility is permitted to implement a temporary rate increase up to "the amount of the proposed annual rate request through equal percentage increases or decreases applied to all base rates." Once this rate change occurs, the commission is powerless to stop it unless the commission finds good cause to do so, which did not occur in either case. Additionally, the statute clearly specifies what type of rate can be implemented, i.e., only those through "equal percentage" increases and decreases. Hence, the Legislature was not concerned with cost-based rates in the *initial* implementation of a temporary rate change. Instead, it appears that the policy of cost-based rates is effectuated at the *conclusion* of the temporary rate, as the statute provides a self-implementing remedy of returning the excess collected from customers if the ultimate rate approved is lower than that provided for in the temporary, equal-percentage rate change. Thus, because the commission did not issue a final order within 180 days of either application, nor did it find good cause to prevent or delay the temporary rate changes, the orders were illegal and must be vacated.

This conclusion is consistent with MCL 460.11(1). That statute requires the commission to implement over a five-year period "electric rates equal to the cost of providing service to each customer class . . . ." Enforcement of MCL 460.6a(1) does nothing to interfere with this phase-in obligation, as the commission can, in these

cases and all other cases, ensure that the rates established in final orders meet the cost-based rate requirements of MCL 460.11(1). Just as importantly, if allowing these temporary rate increases by the utilities does interfere with the commission's obligation under MCL 460.11(1), nothing prohibits the commission from using that reason for establishing good cause to prohibit the temporary rate increases under MCL 460.6a(1). But where, as in these cases, the commission fails to both timely issue a final order and issue any order finding good cause to stop the temporary order, the utility is free to implement the temporary rate increases consistent with MCL 460.6a(1).

Finally, whether the temporary rate orders permitted under MCL 460.6a(1) actually interfere with the commission's obligation to phase-in cost-based rates is of no moment to our duty to enforce the plain statutory language contained in the statute. Given the specific time tables and remedies contained in these statutes, there can be little doubt that the Legislature has carefully crafted the obligations of both the commission and utilities. If enforcing these clear statutes does in fact substantially interfere with the commission's obligation for the five-year phase-in of cost-based rates, the Legislature can amend the provisions of MCL 460.6a(1). We cannot do so by judicial fiat. *Moran v People*, 25 Mich 356, 364-365 (1872) (a court may not strain a statute by construction because this would be legislating by the judiciary).[1]

---

[1] Additionally, the commission cannot invoke as a canon of statutory construction what it perceives to be in the "public interest," i.e., Michigan's current economic climate. Instead, the "public interest" is set by the Legislature, and two clear statutes cannot be read to mean something they do not because of its perceived affect on the current economic climate.