# STATE OF MICHIGAN

# COURT OF APPEALS

In re application of CONSUMERS ENERGY
for reconciliation of costs

---

TES FILER CITY STATION LIMITED
PARTNERSHIP,

        Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION,

        Appellee,

and

CONSUMERS ENERGY COMPANY,

        Petitioner-Appellee,

and

ATTORNEY GENERAL,

        Appellee.

FOR PUBLICATION
May 28, 2015
9:10 a.m.

No. 314361
MPSC
LC No. 00-016045-R

---

In re application of CONSUMERS ENERGY
COMPANY for 2011 reconciliation

---

CADILLAC RENEWABLE ENERGY, LLC,
GENESEE POWER STATION LIMITED
PARTNERSHIP, GRAYLING GENERATING
STATION LIMITED PARTNERSHIP,
HILLMAN POWER COMPANY, TES FILER
CITY STATION LIMITED PARTNERSHIP,
VIKING ENERGY OF LINCOLN, INC, and
VIKING ENERGY OF MCBAIN, INC,

-1-

Appellants,

v

MICHIGAN PUBLIC SERVICE COMMISSION,

Appellee,

and

CONSUMERS ENERGY COMPANY,

Petitioner-Appellee.

No. 316868
MPSC
LC No. 00-016432-R

BEFORE: RONAYNE KRAUSE, P.J. AND WILDER AND STEPHENS, JJ.

STEPHENS, J.

In Docket No. 314361, the Michigan Public Service Commission ("PSC") issued an order approving the application of Consumers Energy Company ("Consumers") for a power supply cost recovery ("PSCR") reconciliation for the 2010 calendar year. Relevant to this appeal, it approved Consumer's payments to biomass merchant plants ("BMPs") of $10,566,059 for capped excess fuel and variable operation and maintenance costs, but denied the request of TES Filer City Station, Limited Partnership ("TES Filer"), a BMP, for recovery of additional funds for nitrous oxide ("NOx") and sulfur dioxide ("SO2") allowances. TES Filer appeals as of right.

In Docket No. 316868, the PSC issued an order approving Consumers' application for a PSCR reconciliation for the 2011 calendar year. Relevant to this appeal, it determined that the $1,000,000 monthly capped fuel and variable operation and maintenance costs payment to the BMPs should be adjusted annually by applying the annual United States consumer price index rate to the $1,000,000, and that the request by TES Filer for an additional recovery of $102,799 for NOx and SO2 allowances would be disallowed. Appellants appeal as of right.

These two appeals were consolidated. See *In re Application of Consumers Energy for Reconciliation of Costs,* unpublished order of the Court of Appeals, entered May 21, 2014 (Docket Nos. 314361, 316868). We conclude that the PSC properly disallowed TES Filer's request for recovery of additional funds for NOx and SO2 allowances. However, we conclude that the PSC erred in adjusting the $1,000,000 monthly cap on the fuel and variable operation and maintenance costs payable to the BMPs.

## I. STANDARD OF REVIEW

In *In re Application of Consumers Energy Company for Rate Increase*, 291 Mich App 106, 109-110; 804 NW2d 574 (2010), the applicable standard of review was set forth as follows:

The standard of review for PSC orders is narrow and well defined. Pursuant to MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. See also *Michigan Consolidated Gas Co v Pub Serv Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of proving by clear and convincing evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a statutory requirement or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999). A reviewing court gives due deference to the PSC's administrative expertise, and should not substitute its judgment for that of the PSC. *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999).

A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *In re Application of Consumers Energy Co*, 279 Mich App 180, 188; 756 NW2d 253 (2008). Whether the PSC exceeded the scope of its authority is a question of law that is reviewed de novo. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003).

The standard of review for an agency's interpretation of a statute was set forth in *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 103; 754 NW2d 259 (2008), quoting *Boyer-Campbell v Fry*, 271 Mich 282, 296-297; 260 NW 165 (1935):

"[T]he construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons. However, these are not binding on the courts, and [w]hile not controlling, the practical construction given to doubtful or obscure laws in their administration by public officers and departments with a duty to perform under them is taken note of by the courts as an aiding element to be given weight in construing such laws and is sometimes deferred to when not in conflict with the indicated spirit and purpose of the legislature."

This standard requires "respectful consideration" and "cogent reasons" for overruling an agency's interpretation. Furthermore, when the law is "doubtful or obscure," the agency's interpretation is an aid for discerning the Legislature's intent. However, the agency's interpretation is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue. [Citation omitted; first alteration added; second alteration in *Rovas*.]

## II. STATUTE AT ISSUE

With 2008 PA 286, the Legislature enacted statutes that allow a qualifying biomass merchant plant to recover, subject to limitations set forth in MCL 460.6a(8), "reasonably and prudently incurred actual fuel and variable operation and maintenance costs [that] exceed the

amount that the merchant plant is paid" for those costs under a contract with an electric utility. MCL 460.6a(7). Appellants are qualifying BMPs under this statute. The subsection (8) limitation on recovery, in pertinent part, limits the total aggregate additional amounts that an electric utility will have to pay to merchant plants to $1,000,000.00 per month, but provides for annual review of this limit upon petition of a merchant plant and adjustment if each affected merchant plant files a petition and "the commission finds that the eligible merchant plants reasonably and prudently incurred actual fuel and variable operation and maintenance costs" that exceed $1,000,000.00 per month. Subsection (8) in pertinent part further provides:

> The annual amount of the adjustments shall not exceed a rate equal to the United States consumer price index. . . . As used in this subsection, "United States consumer price index" means the United States consumer price index for all urban consumers as defined and reported by the United States department of labor, bureau of labor statistics.

Subsection (8) continues:

> The $1,000,000.00 limit specified in this subsection, as adjusted, shall not apply with respect to actual fuel and variable operation and maintenance costs that are incurred due to changes in federal or state environmental laws or regulations that are *implemented* after the effective date of the amendatory act that added this subsection. [Emphasis added.]

Thus, the BMPs are entitled to a collective capped amount of up to $1,000,000 per month, as adjusted, and an uncapped amount if the costs are incurred due to changes in federal or state environmental laws or regulations that are implemented after the effective date of 2008 PA 286, which is October 6, 2008.

## III. TES FILER's ENTITLEMENT TO RECOVER FOR NOx AND SO2 ALLOWANCES

TES Filer challenges the denial of its requests for recovery of costs for NOx and SO2 allowances, explaining that the allowances are limited authorizations to emit these substances. It established that these were "actual fuel and variable operation and maintenance costs." It asserts that they were "incurred due to changes in federal or state environmental laws or regulations" "implemented after" October 6, 2008, maintaining that "implementation" must refer to the date that some action is required by a law or regulation. The PSC interpreted § 460.6a(8) to mean that the term "implemented" refers to the date that a federal or state environmental law or regulation was enacted or promulgated. It further determined that TES Filer was not entitled to recover the costs of the NOx and SO2 allowances incurred in the 2010 and 2011 calendar years because the laws or regulations requiring the allowances predated October 6, 2008. We find no cogent reason to overturn the PSC's interpretation.

The facts relevant to this issue are as follows:

May 12, 2005      United States Environmental Protection Agency (EPA)
                  promulgated the Clean Air Interstate Rule (CAIR)
                  requiring changes to State Implementation Plans (SIPs) to

-4-

| | |
|---|---|
| | include measures to reduce NOx and SO2 emissions [70 Fed Reg 25162 et seq (May 12, 2005)] |
| August 24, 2005 | In proposed rules, the EPA notes that the CAIR requires emission reduction implementation in two phases, with the first phase of NOx reductions starting in 2009 and the first phase of SO2 reductions starting in 2010 [70 Fed Reg 49721 (August 24, 2005)] |
| June 25, 2007 | Michigan Department of Environmental Quality (MDEQ) promulgates rules on NOx allowances subjecting them to regulation commencing in 2009 [See 2007 Mich Reg 12, R 336.1802a et seq, indicating rules were filed with Secretary of State on June 25, 2007 and became effective immediately] |
| July 16, 2007 | Michigan submits CAIR SIP (the June 25, 2007 MDEQ promulgated rules) to the EPA [See 74 Fed Reg 41637-41641 (August 18, 2009)] |
| December 20, 2007 | The EPA conditionally approves Michigan's SIP if revisions are made by December 20, 2008 [72 Fed Reg 72256-722631 (December 20, 2007)] |
| October 6, 2008 | Effective date of § 460.6a(8) |
| June 10, 2009 | After missing the December 20, 2008 deadline, MDEQ submits new SIP to EPA [See 74 Fed Reg 41637-41641 (August 18, 2009)] |
| June 15, 2009 | MDEQ promulgates new rules on NOx allowances, which is apparently what was sent to the EPA as the new SIP [2009 Mich Reg 10 (June 15, 2009)] |
| August 18, 2009 | EPA approves Michigan SIP, effective October 19, 2009, and provides "notice that the December 20, 2007, conditional approval of July 16, 2007, submittal automatically converted to a disapproval." However, it concluded that the disapproval was inconsequential because it was "approving both the July 16, 2007 and the June 10, 2009 submittals, in combination, as meeting the CAIR requirements" [See 74 Fed Reg 41637-41641 (August 18, 2009)] |
| November 2009 | TES Filer incurs NOx allowance expenses for the first time |
| July 2010 | TES Filer incurs SO2 expenses for the first time |

The § 460.6a(8) statutory phrase, "incurred due to changes in federal or state environmental laws or regulations that [were] implemented after" October 6, 2008, could be read to mean that a BMP is entitled to recoup actual fuel and variable operation and maintenance costs if the *requirements* of the changes in the laws or regulations were implemented after the effective date or, alternatively, if the changes to the law or regulations were made (implemented) after the effective date. In *In Re Application of Indiana Michigan Power Co to Increase Rates,* 297 Mich App 332, 344-345; 824 NW2d 246 (2012), quoting *Mich Basic Prop Ins Ass'n v Office of Fin & Ins Regulation*, 288 Mich App 552, 559-560; 808 NW2d 456 (2010) (citations omitted), the Court stated in pertinent part:

> A statutory provision is ambiguous if it irreconcilably conflicts with another provision or when it is equally susceptible to more than one meaning. A statutory provision should be viewed as ambiguous only after all other conventional means of interpretation have been applied and found wanting. If a statute is ambiguous, judicial construction is appropriate. "Where the language of a statute is of doubtful meaning, a court must look to the object of the statute in light of the harm it is designed to remedy, and strive to apply a reasonable construction that will best accomplish the Legislature's purpose." *Marquis v Hartford Accident & Indemnity (After Remand)*, 444 Mich 638, 644, 513 NW2d 799 (1994). . . .

> When construing a statute, "a court should not abandon the canons of common sense." *Marquis*, 444 Mich at 644. "We may not read into the law a requirement that the lawmaking body has seen fit to omit." *In re Hurd-Marvin Drain*, 331 Mich 504, 509, 50 NW2d 143 (1951). When the Legislature fails to address a concern in the statute with a specific provision, the courts "cannot insert a provision simply because it would have been wise of the Legislature to do so to effect the statute's purpose." *Houghton Lake Area Tourism & Convention Bureau v Wood*, 255 Mich App 127, 142, 662 NW2d 758 (2003). Therefore, when necessary to interpret an ambiguous statute, the appellate courts must determine the reasonable construction that best effects the Legislature's intent.

Both TES Filer and the Attorney General maintain that the statute is not ambiguous because the last antecedent rule supports their opposing interpretations of the statute. This rule of statutory construction "provides that a modifying or restrictive word or clause contained in a statute is confined solely to the immediately preceding clause or last antecedent, unless something in the statute requires a different interpretation." *Stanton v Battle Creek*, 466 Mich 611, 616; 647 NW2d 508 (2002). In *Hardaway v Wayne* Co, 494 Mich 423, 429; 835 NW2d 336 (2013), the Court held that "the last antecedent rule does not mandate a construction based on the shortest antecedent that is grammatically feasible," quoting 2A Singer & Singer, Sutherland Statutory Construction (7th ed), § 47.33, pp 487-489 for the proposition that "[r]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent. The last antecedent is 'the last *word, phrase, or clause* that can be made an antecedent *without impairing the meaning of the sentence*.'" (Emphasis added in *Hardaway*).

Again, the statute provides that the cap "shall not apply with respect to actual fuel and variable operation and maintenance costs that are incurred due to changes in federal or state

environmental laws or regulations that are implemented after" October 6, 2008. The Attorney General argues that the phrase "that are implemented" refers to the antecedent clause "that are incurred due to changes in federal or state environmental laws or regulations." TES Filer argues that the phrase "that are implemented" refers to "changes in federal or state environmental laws or regulations." However, this does not clarify what "changes" are being referred to. We note that the last antecedent word or phrase before "that are implemented" is "federal or state environmental laws or regulations." If it is these laws or regulations "that are implemented," as opposed to "changes in" these "laws or regulations," then TES Filer would prevail with respect to its argument that implementation occurred when the laws or regulations were required to be carried out. However, this construction would render "changes in" mere surplusage. "Courts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002). Since the last antecedent rule does not require a look at the shortest antecedent, and the antecedent that makes sense of all the terms is "changes in federal or state environmental laws or regulations," the phrase "that are implemented" should be viewed as referring to "changes in federal or state environmental laws or regulations."

This leaves open the question of whether the "changes" implemented are those required by the law or regulation, or whether they are the changes to the law or regulation. TES Filer argues that "changes" are "implemented" when they are actually fulfilled, carried out, executed, or effectuated. With respect to NOx allowances, TES Filer made the same argument in *In re Application of Consumers Energy Co for Reconciliation of 2009 Costs,* unpublished opinion per curiam of the Court of Appeals, issued April 29, 2014 (Docket Nos. 305066 and 305083). We adopt the reasoning from that opinion:

> On appeal, TES Filer argues that the PSC erred by ignoring the significance of the word "implemented" in MCL 460.6a(8). TES Filer asserts that the common meaning of the word "implemented" is "to have carried out, fulfilled, or effectuated a plan." TES Filer notes that the rules promulgated by the Michigan Department of Environmental Quality (MDEQ) in 2007 did not impose new regulations at that time, but were intended to do so in 2009; thus, the PSC should have concluded that the 2007 rules, even if in effect during the relevant period, were not implemented during that same period. The rules were implemented after MCL 460.6a(8) went into effect; therefore, TES Filer was entitled to recover its costs. We disagree.

> TES Filer ignores the context surrounding the word "implemented" in the statutory scheme. This Court does not read statutory provisions in isolation, but instead considers them in context. *Robinson v City of Lansing*, 486 Mich 1, 15; 782 NW2d 171 (2010). The NOx emission rules that were applicable to TES Filer did not change after October 6, 2008, the date that MCL 460.6a(8) went into effect. At issue in this case is not the meaning of the term "implemented," but rather on what date TES Filer was affected by the NOx emission rules. In context, MCL 460.6a(8) provides that the limit does not apply to specified costs "that are incurred due to changes in federal or state environmental laws or regulations that are implemented after the effective date of the amendatory act

that added this subsection." MCL 460.6a(8) compares the effective date of the statute and the date of any changes in state or federal environmental rules. It is undisputed that MCL 460.6a(8) went into effect on October 6, 2008. The MDEQ promulgated rules by filing them with the Secretary of State on June 25, 2007. MCL 24.246(1). The MDEQ's rules became effective prior to October 6, 2008.

* * *

The MDEQ's rules were implemented in 2007; however, the fact that TES Filer only became subject to the rules in 2009 did not constitute a substantive change in the rules implemented after October 6, 2008. Regardless of the meaning of the word "implemented," the change occurred well before TES Filer incurred its costs. We conclude that TES Filer was not entitled to recover its NOx emission costs. [Unpub op at 7.]

Since the phrase "that are implemented" modifies "changes in federal or state environmental laws or regulations," it refers to implementation of changes in the law or regulation, and not implementation of changes required by these laws or regulations. We note that the context of the statute indicates that the intent was to allow BMPs to recover for the costs of compliance with new requirements. However, if the requirements were in place before October 6, 2008, even if compliance was not yet required, the requirements were not new.

With respect to the NOx requirements, TES Filer argues that the relevant changes in laws or regulations did not occur before October 6, 2008. TES Filer acknowledges that, if enforceable, Mich Admin Code, R 336.1821 to R 336.1834 would have required the purchase of NOx allowances in 2009. However, TES Filer points by way of example to R 336.1822(2), noting that it speaks of "CAIR NOx allowances for the 2009 ozone season control period." It notes that under R 336.1803(3), "CAIR NOx allowance" must be defined by reference to 40 CFR 97.102, which provides:

CAIR NOx allowance means a limited authorization issued by a permitting authority or the Administrator under subpart EE of this part or §97.188, or under provisions of a State implementation plan that are approved under §51.123(o)(1) or (2) or (p) of this chapter, to emit one ton of nitrogen oxides during a control period of the specified calendar year for which the authorization is allocated or of any calendar year thereafter under the CAIR NOx Program. An authorization to emit nitrogen oxides that is not issued under subpart EE of this part, §97.188, or provisions of a State implementation plan that are approved under §51.123(o)(1) or (2) or (p) of this chapter shall not be a CAIR NOx allowance.

Similarly, 40 CFR 97.302 defines "CAIR NOx Ozone Season allowance" as

a limited authorization issued by a permitting authority or the Administrator under subpart EEEE of this part, §97.388, or provisions of a State implementation plan that are approved under §51.123(aa)(1) or (2) (and (bb)(1)), (bb)(2), (dd), or (ee) of this chapter, to emit one ton of nitrogen oxides during a control period of the specified calendar year for which the authorization is allocated or of any calendar

-8-

year thereafter under the CAIR NOx Ozone Season Trading Program or a limited authorization issued by a permitting authority for a control period during 2003 through 2008 under the NOx Budget Trading Program in accordance with §51.121(p) of this chapter to emit one ton of nitrogen oxides during a control period, provided that the provision in §51.121(b)(2)(ii)(E) of this chapter shall not be used in applying this definition and the limited authorization shall not have been used to meet the allowance-holding requirement under the NOx Budget Trading Program. An authorization to emit nitrogen oxides that is not issued under subpart EEEE of this part, §97.388, or provisions of a State implementation plan that are approved under §51.123(aa)(1) or (2) (and (bb)(1)), (bb)(2), (dd), or (ee) of this chapter or under the NOx Budget Trading Program as described in the prior sentence shall not be a CAIR NOx Ozone Season allowance.

Since both of these CFRs refer to state SIPs that have been approved, TES Filer concludes that references in Michigan's 2007 rules to CAIR NOx allowances and CAIR NOx Ozone Season allowances can only refer to allowances authorized by a state plan that has been approved by the EPA. Since Michigan's rules were not approved until 2009, TES Filer asserts that the 2007 rules were nonfunctional. Accordingly, it argues, TES Filer could not have incurred its 2009 NOx allowance costs due to changes in regulations implemented before October 6, 2008 because the 2007 regulations did not regulate NOx allowances.

This is a compelling argument, especially since the EPA expressly disapproved Michigan's 2007 rules when it approved Michigan's 2009 rules. However, as a matter of state regulations, the 2007 rules required CAIR NOx allowances for 2009. As stated above, the state regulations became effective on June 25, 2007 immediately upon filing with the Secretary of State. While CAIR NOx allowances and CAIR NOx Ozone Season allowances refer to allowances issued under a federally-approved SIP, this would mean that the 2007 rules required these allowances at the point that the EPA approved the state SIP. The requirement existed in 2007 but did not mature into an obligation until there was EPA approval. Since the allowances were required by the 2007 state regulations, the costs of the allowances were incurred due to 2007 changes in state environmental regulations, and the changes in the regulations were implemented in 2007, before the October 6, 2008 effective date of subsection (8). Accordingly, TES Filer was not entitled to recoup these costs.

Just as regulations requiring NOx allowances were implemented before October 6, 2008, regulations requiring SO2 allowances were implemented before October 6, 2008. Although it did not require that the SO2 allowances be immediately purchased, it is undisputed that in 2005 the CAIR required the SO2 allowances. Since this change in the law was implemented before October 6, 2008, regardless of the fact that TES Filer did not become subject to the law until 2010, TES Filer is not entitled to uncapped recovery of its SO2 allowances costs.

IV.  ADJUSTMENT METHODOLOGY

In Docket No. 316868, the BMPs challenge the method by which the PSC calculated the annual adjustment to the $1,000,000 monthly capped limit on the fuel and variable operation and maintenance costs payment that the utilities must make to BMPs.  Again, § 460.6a(8) provides that the $1,000,000 per month capped limit "may be adjusted" if each affected BMP petitions but "[t]he annual amount of the adjustments shall not exceed a rate equal to the United States consumer price index ["CPI"]."  The BMPs posited that this should be interpreted to mean that the Commission should adjust the $1,000,000 monthly limit at a rate equal to the percentage increase in the annual average CPI between 2009, the year after § 460.6a(8) became effective, and 2011, the PSCR year at issue.  Alternatively, the BMPs proposed that the adjusted monthly limit from the prior year be multiplied by the annual CPI.  However, the PSC interpreted this provision to mean that the adjustment should be calculated each year by multiplying $1,000,000 by the annual CPI, rather than by a cumulative CPI.

We conclude that the statute is equally susceptible to more than one meaning with regard to this question and is therefore ambiguous.  See *In Re Application of Indiana Michigan Power Co to Increase Rates,* 297 Mich App at 344.  The BMPs argue that use of the plural, "adjustments," indicates that cumulative annual "adjustments" were intended.  However, use of the term "adjustments" is not determinative.  It could refer to the annual adjustments made each year without contemplating that they be cumulative.  Moreover, if the Legislature had instead said "the annual amount of the adjustment[] shall not exceed a rate equal to the United States consumer price index," it would not have provided clarity regarding what sum is to be adjusted or regarding whether the term "rate equal to the United States consumer price index" was meant to reflect the yearly rate or a cumulative rate.  However, the PSC's reasoning on the meaning of the pluralization is not logical.  It posited that

> the statute contemplates multiple petitions: "An adjustment shall not be made by the commission unless each affected merchant plant files a petition with the commission."  MCL 460.6a(8).  Therefore, the use of the plural "adjustments" is logically related to the fact that the provision is not limited to one merchant plant, but can [sic] applied to any plant that satisfies the substantive requirements.

The statute allows for and requires petitions from all affected BMPs in order for there to be an adjustment, but the adjustment made is to the $1,000.000 cap.  There is only one annual adjustment to the cap, not multiple adjustments reflecting the applications of the various BMPs.  In sum, the pluralization of "adjustment" is inconclusive when trying to discern the meaning of the statute.

The PSC also reasoned that although the statute did not prohibit a cumulative CPI calculation, it did not expressly provide for such a calculation, and it could not read words into the statute.  However, to conclude that the language of the statute means that the "rate equal to the United States consumer price index" means solely the rate corresponding to the year of the PSCR reconciliation would also require that language be added for clarification.

The language of the statute does not provide guidance on whether the CPI to be used for the annual adjustments is the cumulative CPI or the CPI for a given year.  Moreover, it does not

speak to whether the cap that should be adjusted is the $1,000,000 cap or the $1,000,000 cap as adjusted in prior years. However, by tying the adjustment to the CPI, it seems clear that the Legislature's intent was to account for inflation.[1] If the $1,000,000 cap were adjusted each year based on the CPI rate for that year, the BMPs would receive the inflation-adjusted equivalent of less than $1,000.000 per month beginning in the 2011 calendar year. Thus, upholding the PSC's construction of the statute would lead to a potentially absurd result seemingly at odds with legislative intent. Since the overriding goal of statutory construction is to give effect to the intent of the Legislature, *In Re Application of Indiana Michigan Power Co to Increase Rates,* 297 Mich App at 344-345, and this requires a construction that avoids absurd results when possible, see *Detroit Int'l Bridge Co v Commodities Export Co*, 279 Mich App 662, 674-675; 760 NW2d 565 (2008), we conclude that the PSC erred in construing § 460.6a(8). Further, we conclude that it should be construed to mean that annual adjustments to the $1,000,000 cap shall be calculated by applying the CPI rate for the PSCR year at issue to the $1,000,000 cap as adjusted in prior years, or by applying the cumulative CPI rate from 2009 forward to the $1,000,000 cap.

Affirmed in part, reversed in part and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Amy Ronayne Krause

---

[1] We note that Appendix D to 31 CFR 356 provides:

> The Consumer Price Index ("CPI") for purposes of inflation-protected securities is the non-seasonally adjusted U.S. City Average All Items Consumer Price Index for All Urban Consumers. It is published monthly by the Bureau of Labor Statistics (BLS), a bureau within the Department of Labor. The CPI is a measure of the average change in consumer prices over time in a fixed market basket of goods and services. This market basket includes food, clothing, shelter, fuels, transportation, charges for doctors' and dentists' services, and drugs.
>
> In calculating the index, price changes for the various items are averaged together with weights that represent their importance in the spending of urban households in the United States. The BLS periodically updates the contents of the market basket of goods and services, and the weights assigned to the various items, to take into account changes in consumer expenditure patterns.

We find no basis for disagreement that the CPI is intended to be a measure of inflation.